# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1165

JOSE SURITA, MARGARET CARRASCO
and CHRIS BLANKS,

*Plaintiffs-Appellees,*

*v.*

RICHARD HYDE and WILLIAM BIANG,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6586—**Milton I. Shadur**, *Judge.*

ARGUED JANUARY 7, 2011—DECIDED DECEMBER 22, 2011

Before MANION and WILLIAMS, *Circuit Judges*, and
CLEVERT, *District Judge.**

CLEVERT, *District Judge.* A towing ordinance of the
City of Waukegan generated several rallies or marches

---

* The Honorable Charles N. Clevert, Jr., Chief Judge of the
United States Court for the Eastern District of Wisconsin, sitting
by designation.

in opposition. While dealing with protestors, City officials barred a citizen from speaking at a city council meeting and imposed outdoor assembly permit and fee requirements. Several individuals then sued the City, its mayor, and its police chief under 42 U.S.C. § 1983, alleging violations of their First Amendment rights of free speech, of assembly, and to petition government for redress of grievances. Mayor Richard Hyde and Police Chief William Biang appeal the district court's denial of qualified immunity as to the First Amendment claims of Jose Surita, Margaret Carrasco, and Chris Blanks.

I

In 2002 the City of Waukegan amended its towing ordinance to allow police to seize and impound vehicles and to impose a $500 fine on persons driving without a valid license or proof of insurance (the "Towing Ordinance"). The Towing Ordinance generated protests that it applied more harshly against minorities.

In early- and mid-2004, Waukegan maintained an outdoor assembly ordinance establishing procedures for the permitting of certain outdoor events (the "Assembly Ordinance"). Written application for a permit had to be made twenty days in advance of the outdoor event, and Waukegan had discretion to require the organizer of the event to pay a cash deposit as a condition of permit issuance. Waukegan's police department was responsible for conducting an investigation and making a report and recommendation to the city clerk in connection with events covered by the Assembly Ordinance.

A. Surita's Claims against Mayor Hyde

During a large rally on January 18, 2004, at Waukegan's Belvidere Mall, Jose Surita criticized Susana Figueroa, the City's community liaison officer. Although details of the encounter are in dispute, the parties agree that Surita told Figueroa "she should do more to help her people." Following the rally, Figueroa reported to Mayor Richard Hyde that Surita had been very angry, "got in her face," and caused her to fear that he would attack her physically.

The Waukegan City Council set aside ten minutes at the end of each of its bimonthly meetings for "audience time." Any member of the public could talk for up to three minutes, on any subject. The mayor was presiding officer and chair of the meetings.

At a meeting on January 20, 2004, Mayor Hyde told Surita, as he stood at the microphone during audience time, that he would not be allowed to speak until he apologized to Figueroa. Hyde chastised Surita for his comments to Figueroa at the Belvidere Mall rally two days earlier:

> All right. Now I want to make one thing clear here because I was going to talk to this gentleman. . . . The city employees do what they are asked by the city ordinances. We have a Community Liaison Officer. We don't have an Afro American, we have got a Hispanic and she works for the City of Waukegan. Now, Sunday she was severely confronted with language right in her face by a male. And, now, any man that does that to a woman is lower than a rat. So before I will hear any person of that speaking, you

will come to see me after the council meeting and you will go to that lady and you will apologize because you severely hurt her, her personality and her feelings. . . . And if that person does not apologize to her in person to her face, the next time that happens I will have that person arrested and booked on intimidation. And that is legal. That is very legal. I want to make that known right now because I don't think our employees should have to put up with anything from anybody because they are city employees. They are doing what they are told to do. And this Hispanic lady was confronted with a Hispanic man. And how any man could talk to a woman like that, I don't know. If he was talking to another man like that he'd be decked, right there. So that is all I have to say about that. Okay. No, I am not going to listen to you until you get up and you go to . . . Suzanne—I'm talking to you. Until you go to Suzanne Figueroa and you apologize to her. Thank you. Okay, Alderman's time.

Surita wanted to discuss the Towing Ordinance during audience time but did not speak at the city council meeting. Other members of the public addressed the council at the meeting, some discussing the Towing Ordinance.

### B. Carrasco's Claims against Police Chief Biang

Margaret Carrasco opposed the Towing Ordinance and participated in a march on June 28, 2004, to protest it. Waukegan's Chief of Police, William Biang, was informed

that Carrasco intended to conduct a rally on July 6, 2004, in conjunction with a city council meeting that night. He was told the upcoming rally would be larger than one at which protesters seemed hostile to police.

On July 1, 2004, Biang sent an officer to Carrasco's house to ask her to attend a meeting that day to discuss the upcoming rally. Carrasco attended the meeting that afternoon with Biang, three other police officers, and city attorney Gretchen Neddenriep. Exactly what was said at the July 1 meeting is disputed, but the parties agree that Carrasco said she and others would attend the city council meeting on July 6.

At the July 1 meeting, Neddenriep handed Carrasco a copy of the Assembly Ordinance and asked her to comply with it. A follow-up letter from Neddenriep the next day stated that Waukegan would waive the requirement that the application be filed in advance but that Carrasco had to pay a permit fee of $1,500. The fee was based on the number of extra police officers Biang determined were needed for the rally (ten officers at $50 per hour for three hours each). Biang was copied on the letter.

Biang has said that he determined more officers were needed for the rally because it was a protest as opposed to a rally in favor of a City ordinance. Out of 530 events in a five-year period, only two were determined to require payment of a permit fee, and those were protests against the Towing Ordinance. The two events triggering a permit fee were Carrasco's possible event and another planned by Chris Blanks, discussed below.

On July 6, 2004, Carrasco told Biang and Neddenriep that there would be no event that day, pointing out that no deposit was required for overflowing city council meetings. At the July 6 city council meeting Biang reserved eight or ten seats for Carrasco and her group.

### C. Blanks's Claims against Police Chief Biang

Chris Blanks engaged in numerous protest activities against the Towing Ordinance, including attending the Belvidere Mall rally and speaking at city council meetings in July and August 2004. Biang was aware that Blanks was an outspoken critic of the Towing Ordinance.

In August 2004, Blanks advertised a rally against the Towing Ordinance to be held September 4, 2004, in Bedrosian Park, which was owned by the Waukegan Park District. The Park District had its own permit rules, and the Assembly Ordinance did not apply to its property.

After learning of the planned rally, Biang instructed his deputy chief, Artis Yancey, to check whether Blanks had a permit from the Park District and to "handle it." Yancey learned that Blanks had no permit and told Neddenriep.

On September 2, 2004, Neddenriep had a uniformed police officer deliver a letter to Blanks advising him that he was violating the Assembly Ordinance because he had not obtained a permit twenty days in advance. The letter told Blanks that failure to comply with the Assembly Ordinance would result in a violation. How-

ever, the letter did not advise Blanks that the Park
District, rather than Waukegan, owned Bedrosian Park.

Biang and the city prosecutor were copied on the
letter. Blanks was the only person ever advised in
writing in advance of an event that he was violating
the Assembly Ordinance. Moreover, he and Carrasco
were the only persons against whom the Assembly Ordi-
nance was enforced. After receiving the letter Blanks
canceled the September 4 rally.

## II

No final judgment was entered by the district court
because the case has not concluded. Generally, federal
appellate courts possess jurisdiction to hear appeals
from final decisions only, *see Viilo v. Eyre*, 547 F.3d 707,
711 (7th Cir. 2008), and denials of summary judgment
do not qualify as final decisions in most instances, *Ortiz v.
Jordan*, 131 S. Ct. 884, 891 (2011). However, Hyde and
Biang appeal the denial of qualified immunity. Assertions
of qualified immunity may fall under one of the excep-
tions to final judgment under the collateral order doc-
trine. *Id.*; *Viilo*, 547 F.3d at 711. Some pretrial orders
denying qualified immunity are appealable immediately
because review after trial would come too late to
vindicate the right of public officials not to stand trial.
*Mitchell v. Forsyth*, 472 U.S. 511, 525-27 (1985); *Viilo*, 547
F.3d at 711. Accordingly, orders denying summary judg-
ment on the basis of qualified immunity are appealable
immediately when the appellate court need not consider
the correctness of the plaintiff's version of the facts but

need only determine a question of law. *Mitchell,* 472 U.S. at 528; *Viilo*, 547 F.3d at 711. If the immunity question cannot be decided without resolving a disputed question of fact, we lack jurisdiction over the appeal of that question. *Ortiz*, 131 S. Ct. at 891; *Hill v. Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010).[1]

We review de novo the district court's denial of defendants' motions for summary judgment based on qualified immunity. *Hill*, 627 F.3d at 605.

Qualified immunity protects government officials from liability for civil damages if their actions did not violate "clearly established statutory or constitutional

---

[1]  In some cases, the district court may conclude that even under the facts presented by the defendant, the defendant's actions violated clearly established law and qualified immunity does not apply. In others, the district court may deny summary judgment because if the facts are found in the plaintiff's favor the defendant is not immune. *Mitchell*, 472 U.S. at 527. Here, the district judge granted summary judgment for plaintiffs Surita and Carrasco, determining that even under defendants' version of the facts plaintiffs Surita and Carrasco had established that their constitutional rights were violated, thus rejecting those assertions of qualified immunity completely. However, only the denial of qualified immunity under the collateral order rule is appealable; the grant of summary judgment in favor of plaintiffs Surita and Carrasco is not a final appealable order. As to Blanks's claims, the judge denied Biang's motion for summary judgment based on qualified immunity but did not grant summary judgment in Blanks's favor.

rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It shields an officer from liability if the officer "reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244. Analysis of an assertion of qualified immunity involves two familiar questions: (1) whether a constitutional right was violated using plaintiff's version of the facts, and (2) whether that right was clearly established at the time. *Pearson*, 555 U.S. at 236; *Viilo*, 547 F.3d at 709-10.

To be clearly established a right must be specific to the relevant factual context of a cited case and not generalized with respect to the amendment that is the basis of the claim. *Viilo*, 547 F.3d at 710. However, a case with similar facts is not necessarily required; the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1023 (7th Cir. 2000).

### A. Surita's Claims against Mayor Hyde

The district court characterized Surita's First Amendment[2] claim as based on two theories: (1) the audience time portion of the city council meetings was a

---

[2] Although we reference the First Amendment, the protections of that amendment apply to the states through the Fourteenth Amendment. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

designated public forum and Mayor Hyde's refusal to allow Surita to speak was a content-based restriction not narrowly tailored to a compelling governmental interest, and (2) Hyde retaliated against Surita for the exercise of his protected speech at the Belvidere Mall by barring him from speaking at the city council meeting. The district court found in Surita's favor on the first theory and did not address the second.

The First Amendment permits government to regulate use of its property in certain instances depending on the nature of that property. Traditional public forums are places with a long history of being devoted to assembly and debate, such as public streets and parks. Designated public forums are locations or channels of communication that the government opens up for use by the public for expressive activity. Public property not open for public communication by tradition or designation is deemed a nonpublic forum. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 802 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006).

A designated public forum is created when the government intentionally makes property or a channel of communication generally open or available to a class of speakers rather than permitting only selective access to particular speakers who must obtain permission to use it. *Ark. Educ. Television Comm'n*, 523 U.S. at 678-79.

There is no doubt that audience time during Waukegan city council meetings constituted a designated public forum. *See, e.g., City of Madison Joint Sch. Dist. No. 8 v. Wis. Pub. Emp't Relations Comm'n*, 429 U.S. 167, 176 (1976) ("[W]hen the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of . . . their speech."); *Mesa v. White*, 197 F.3d 1041, 1044 (10th Cir. 1999) (noting a lack of dispute regarding whether the public comment period of a county commission meeting was a designated public forum); *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ("City Council meetings like Norwalk's, where the public is afforded the opportunity to address the Council, are the focus of highly important individual and governmental interests. . . . [S]uch meetings, once opened, have been regarded as public forums, albeit limited ones."); *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989) ("[T]he city commission designated their meeting a public forum when the commission intentionally opened it to the public and permitted public discourse on agenda items."); *see Collinson v. Gott*, 895 F.2d 994, 1000 (4th Cir. 1990) (Phillips, J., concurring) ("Speech at public meetings called by government officials for discussion of matters of public concern is entitled to normal first amendment protections against general restrictions or *ad hoc* parliamentary rulings by presiding officials."); *Musso v. Hourigan*, 836 F.2d 736, 742 (2d Cir. 1988) (noting that an open school board meeting is a place where public speech is usually allowed); *cf. Ark. Educ. Television Comm'n*, 523 U.S. at 680 (contrasting

a nonpublic forum candidate debate with "an open-microphone format"). Hyde concedes that audience time during Waukegan city council meetings was a designated public forum.

Government has only a limited ability to regulate expressive activity in traditional and designated public forums. Any content-based exclusion of speech in such forums is subject to strict scrutiny, meaning that the government must show the exclusion "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n*, 460 U.S. at 45; *accord Ark. Educ. Television Comm'n*, 523 U.S. at 677. Government may enforce reasonable time, place, and manner restrictions provided they are content neutral, they are narrowly tailored to serve a significant government interest, and ample alternative channels of communication exist. *Perry Educ. Ass'n*, 460 U.S. at 45.

Hyde argues his bar on Surita's speech was a permissible time, place or manner restriction because he believed Surita had addressed Figueroa threateningly. However, content neutrality is a basic requirement of a time, place or manner restriction, and the barring of Surita's speech was not content neutral.

Government may not discriminate among speakers. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000); *City of Madison Joint Sch. Dist. No. 8*, 429 U.S. at 176; *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784-85 (1978) ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the

speakers who may address a public issue."). "Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." *Playboy Entm't Grp.*, 529 U.S. at 812. Just as the government may not favor one speaker over another, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995), neither may it disfavor one speaker over another. Although distinctions on the basis of subject matter and identity regarding access to *non*public forums may be inescapable, they are impermissible respecting access to traditional or designated public forums. *See Perry Educ. Ass'n*, 460 U.S. at 49. "The government violates the Free Speech Clause of the First Amendment when it excludes a speaker from a speech forum the speaker is entitled to enter." *Christian Legal Soc'y*, 453 F.3d at 865.

Hyde barred anything and everything Surita proposed to say at a public meeting. Because he excluded a speaker within the class to which the designated public forum was available his action is subject to strict scrutiny. *Ark. Educ. Television Comm'n*, 523 U.S. at 677. Restrictions that favor or disfavor certain speech based on the speaker rather than the content of the message are still content based. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1265 (11th Cir. 2005). The content-based nature of Hyde's restriction on Surita is highlighted by Hyde's demand that Surita apologize regarding statements attributed to him by a city employee. Government officials may neither stifle speech because of its message nor require the utterance of a particular

message they favor. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994); *Solantic, LLC*, 410 F.3d at 1258.

Hyde contends he did not bar Surita from speaking at a city council meeting because of Surita's anticipated objection to Waukegan's Towing Ordinance—indeed, that night other speakers criticized the Towing Ordinance and Figueroa. Instead, Hyde says he barred Surita's speech because of how he believed Surita had confronted Figueroa. Thus, he maintains, the bar was content neutral and permissible.

That others were permitted to speak on the same subject that Surita was expected to address has no bearing on whether the restriction on Surita was content based. The Supreme Court has rejected the argument that a First Amendment violation requires an intention to suppress certain ideas. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993). Actual disagreement with content is not necessary for finding the regulation of speech to be content based. *See id.*; *Mesa*, 197 F.3d at 1045 n.4. Therefore, whether Surita wished to speak in protest against the Towing Ordinance, to congratulate the mayor on a job well done, or to contend that Waukegan should collect garbage differently does not alter the analysis. When Hyde intentionally barred Surita from speaking he barred the content of Surita's speech, regardless of whether he agreed or disagreed with the viewpoint Surita was going to expound.

Moreover, even if Hyde's restriction were content neutral, no reasonable jury would find a total bar on Surita's speech to have been a valid time, place, or manner restriction. On January 20, 2004, Surita approached the microphone at the appropriate time, and no cited evidence suggests that he was planning to address the city council in an inappropriate manner. However, Hyde contends that Surita's prior actions at the Belvidere Mall were possibly criminal disorderly conduct; Hyde heard reports that Surita's conduct at the mall rally was threatening in manner or content. Regardless, Surita's possible disorderly conduct two days earlier cannot justify a restriction at the city council meeting. Surita was not barred from speaking at the city council meeting for disorderly conduct or being belligerent. He was not barred from speaking because he had strayed from an announced limited topic, was being repetitive, or had exceeded his three-minute time frame. *See White*, 900 F.2d at 1426 ("A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner."). He was barred completely because of something that had occurred two days earlier—not at the city council meeting or even related to it. Hyde's willingness to permit Surita to speak if he apologized first undermines any possible argument that Surita was out-of-line at the city council meeting; if his manner were disruptive, Hyde could have barred his speech completely rather than premise

it upon an apology. Hence, the restriction on Surita was not a content-neutral time, place or manner restriction; instead, it was a content-based exclusion that had to be narrowly tailored to effectuate a compelling governmental interest. On that front, Hyde fails to present any compelling interest to justify prohibition of Surita's speech. He argues that his restriction on Surita's speech was justified as a sanction for conduct toward Figueroa.

Penalties for speech protected under the First Amendment are forbidden. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). Viewing the facts in Surita's favor, his speech at the Belvidere Mall was not threatening. But even if Surita threatened Figueroa at the Belvidere Mall rally as Hyde may have been told, nothing in the record indicates that Surita's proposed speech at the city council meeting would be threatening. Therefore, Hyde used Surita's prior speech to prohibit subsequent protected speech. As the district court pointed out, the absolute prohibition on Surita's speech fails the strict-scrutiny test. Consequently, we conclude that Hyde violated Surita's First Amendment rights.

Next we consider whether as of January 20, 2004, a reasonable person should have known that barring Surita from speaking during city council audience time unless he apologized to Figueroa was a constitutional violation. The answer is "yes." *Playboy Entertainment Group*, *City of Madison Joint School District No. 8*, *Perry Education Ass'n*, *Rosenberger*, *Mesa*, and *Jones* predated the January 20, 2004, city council meeting. Taken together, these cases clearly established that the city

council meeting was a designated public forum, that barring a speaker from any speech in a traditional or designated forum constituted a content-based restriction, and that barring Surita from speaking in that designated public forum because of his alleged actions or words two days earlier was not a valid time, place, or manner restriction and thereby constitutionally impermissible. The Supreme Court cases described above set forth the basics of First Amendment forum analysis and the difference between content-based restrictions (including the suppression of a particular speaker's words) and content-neutral time, place and manner restrictions.

Before 2004 several cases applied those standards to settings of public hearings and meetings of government bodies. For instance, the Second Circuit found that under clearly established law as of September 1983, content-based censorship practiced by a school board official during a public hearing constituted a First Amendment violation. *See Musso*, 836 F.2d at 742-44. One concurring judge in *Collinson* found that by March 1987 an official would have known that he could not constitutionally evict a person from a public meeting if there was no reasonable basis for fearing disruption or if his actual purpose was to prevent expression of the speaker's viewpoint. 895 F.2d at 1000 (Phillips, J., concurring).

Hyde asserts that many of these cases, dealing with regulation in the form of legislation, cannot have informed him that his ad hoc action at a city council

meeting would violate Surita's rights. *See, e.g., First Nat'l Bank of Bos.*, 435 U.S. at 784-85 (discussing restrictions on acts of the legislature). Yet, in stating that "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," *Rosenberger*, 515 U.S. at 828, the Supreme Court did not limit its meaning for the word "regulate" solely to legislation or contrast it against individual acts of municipal officials. In fact, *Rosenberger* involved a University committee's refusal to pay for printing costs of a student publication rather than any form of legislation. Further, the *Musso* and *Jones* courts recognized, in 1988 and 1989 respectively, that First Amendment rights may be violated by ad hoc parliamentary rulings at public meetings or hearings. *See* 836 F.2d at 742-44; 888 F.2d at 1331-34. In 1990, the concurring judge in *Collinson* stated that under the law as of March 1987 speech at public meetings was entitled to normal First Amendment protections against ad hoc rulings by presiding officials. 895 F.2d at 1000. These legal rules and standards were acknowledged to be clear more than ten years before Hyde silenced Surita.

Hyde contends that for Surita to avoid his qualified immunity defense Surita had to prove that he intended to suppress speech on the basis of its content. This court discussed in *Hansen v. Bennett* the importation of the intent requirement for a First Amendment claim into the objective qualified immunity standard, finding that the plaintiff must show that a reasonable person in the defendant's position, "'that is, one acting on [defendant's] information and motivated by [defendant's] pur-

pose,' would have known that ejecting [plaintiff from a public hearing] violated his clearly established rights." 948 F.2d 397, 399 n.4 (7th Cir. 1991). Here, Hyde's purpose in silencing Surita is apparent from his words at the city council meeting: he demanded that Surita apologize to Figueroa before he would be allowed to speak. A reasonable person in January 2004 would have known that silencing Surita for that purpose was constitutionally impermissible. Thus, the denial of qualified immunity on this theory is affirmed.

District Judge Shadur did not address Surita's retaliation theory, nor did he mention the retaliation case of *Vukadinovich v. Board of School Trustees of North Newton School Corp.*, 278 F.3d 693 (7th Cir. 2002), in regard to Surita's claim (instead, he did so as to Carrasco's claim). Yet, Hyde contends that the district judge used the standard of *Vukadinovich*, allowing a claim of retaliation for exercise of First Amendment rights to move forward if retaliation was simply one motivating factor of the defendant, rather than the *Fairley* standard requiring that retaliation for exercise of First Amendment rights be the "but-for" cause of the restriction on speech.

In addressing Carrasco's retaliation claim, Judge Shadur used a burden-shifting test from *Vukadinovich*: (1) the speech was constitutionally protected (plaintiff's burden); (2) the defendant's actions were motivated by the plaintiff's protected speech (plaintiff's burden); and (3) the defendant cannot show he would have taken the same action in the absence of the plaintiff's exercise of First Amendment rights (defendant's bur-

den). The judge observed that if Biang met his burden on the third element, the burden shifted back to Carrasco to show that the proffered justifications were pretextual. See *Vukadinovich*, 278 F.3d at 699. This test required at step (2) only that the constitutionally protected speech was a motivating factor.

Hyde and Biang argue that the motivating-factor portion of the *Vukadinovich* test has been rejected. In *Fairley*, 578 F.3d at 525, we wrote that after *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009), but-for causation is part of a plaintiff's burden in all suits under federal law, including First Amendment chilling claims, unless the statute provides otherwise. (The district court decision in the present case predated *Gross* and *Fairley*.) Nevertheless, the *Fairley* court recognized that before trial, if the record contains evidence from which a reasonable jury could find such causation, no more is necessary at that stage, though the instructions at trial must reflect the holding of *Gross*. 578 F.3d at 526.

*Fairley* revived a standard we had used at times. *See Abrams v. Walker*, 307 F.3d 650, 655 (7th Cir. 2002) (stating that a plaintiff cannot prevail without establishing that the challenged action would not have occurred "but for" the protected conduct). We disavowed *Abrams*'s but-for causation in favor of motivating-factor causation in June 2004, *Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004), but returned to but-for causation in *Fairley* in 2009. *Vukadinovich*, which predated *Abrams*, had noted the motivating-factor standard, 278 F.3d at 699, and that the plaintiff had to show the challenged action

would not have occurred but for constitutionally pro-
tected conduct, *id.* at 700. Hyde's barring of Surita's
speech occurred after *Vukadinovich* and *Abrams* but
before *Spiegla*.

Recently, in *Greene v. Doruff,* 660 F.3d 975 (7th Cir.
2011), we addressed the tension in our cases be-
tween motivating-factor causation and but-for causa-
tion, clarifying that First Amendment cases are
governed not by *Gross* but by *Mt. Healthy City School
District Board of Education v. Doyle*, 429 U.S. 274 (1977).
*Greene*, 660 F.3d at 977. We noted that *Spiegla* and *Fairley*
are correct to an extent because the burden of proof
relating to causation is divided between the parties in
First Amendment cases. *Id.* at 979-80. To meet the prima
facie burden regarding causation in a First Amendment
case, a plaintiff needs to show only that the defendant's
conduct was a motivating factor, i.e., a "sufficient factor,"
meaning when something present makes something else
bound to happen. *Id.* at 978-79. The defendant can then
rebut that showing, but only by establishing that his
or her conduct was not a but-for or "necessary condition"
of the harm, i.e., that the harm would have occurred
anyway. *Id.* at 979.

Thus, Judge Shadur was not wrong in referencing a
burden-shifting test that included a plaintiff's burden to
show a motivating factor. Moreover, at the summary
judgment stage the burden-shifting test is used to deter-
mine whether a plaintiff makes it to trial. Even as we
stated in *Fairley*, if evidence exists upon which a rea-
sonable jury could find but-for causation, no more is

necessary to overcome a defendant's summary judg-
ment motion.

Here, viewing the facts in Surita's favor, his speech at
the Belvidere Mall was protected. Hyde argues that he
was not motivated to suppress Surita's point of view but
only the threatening manner in which Surita's view was
delivered. However, Hyde's comments during the city
council meeting indicate that Surita was silenced to
induce him to apologize for the Belvidere Mall speech; by
Hyde's own words, excluding Surita from speaking was
a reaction to what Surita said at the Belvidere Mall.
Thus, Hyde's comments at the meeting provide evidence
that the Belvidere Mall speech was the cause (whether
motivating or but-for) that prevented Surita from ex-
pressing his views at the city council meeting.

Even before January 2004 an official's act taken in
retaliation for the exercise of free speech under the
First Amendment was recognized to violate the Con-
stitution. *Vukadinovich* and *Abrams*, decided in 2002,
made clear that Hyde could not retaliate against some-
one for protected First Amendment speech, whether
acting pursuant to a but-for motive or a substantially
motivating one. Hence, a reasonable official in Janu-
ary 2004 would have known he could not retaliate.

B. Carrasco's Claims Against Police Chief Biang

Carrasco asserts that Biang (1) violated her First Amend-
ment rights by applying the Assembly Ordinance to her
in a discriminatory manner; (2) retaliated against her

for exercising First Amendment rights; and (3) attempted to chill her future exercise of First Amendment rights. Carrasco moved for and was granted summary judgment on her as-applied claim. Defendants moved for and were denied summary judgment as to all of Carrasco's claims.

Biang contends that he did not participate in any unconstitutional conduct because Neddenriep applied the Assembly Ordinance to Carrasco; he contends he had no personal involvement. To be liable under § 1983, a government official must have caused the deprivation of a constitutional right. He may do so if the deprivation occurs at his direction or with his consent or if he "sets in motion a series of events that [he] knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Brokaw*, 235 F.3d at 1012.

It is undisputed that Biang called a July 1 meeting with Carrasco concerning a scheduled rally protesting Waukegan's Towing Ordinance. He also sent an officer to Carrasco's house to ask her to attend the meeting, where Waukegan's Assembly Ordinance was discussed. Viewing the facts in Carrasco's favor, Biang was directly involved in discussion of the application of the Assembly Ordinance. Further, the amount of the deposit for Carrasco's anticipated July 6 outdoor rally was determined based on Biang's recommendation regarding the number of police officers he would assign to the event. Therefore, Biang was personally involved in the actual application of the Assembly Ordinance to Carrasco.

An as-applied challenge is one that charges an act is unconstitutional as applied to a plaintiff's specific

activities even though it may be capable of valid application to others. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 & n.22 (1984).

Parks and streets are traditional public forums. *Cornelius*, 473 U.S. at 802; *Perry Educ. Ass'n*, 460 U.S. at 45. An ordinance requiring a permit and fee before speech in a traditional public forum is allowed amounts to a prior restraint on that speech, but the permit and fee may constitutionally be permitted to regulate competing uses of the forum. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Competing rallies at the same time in the same limited space could reduce the forum's availability for free speech or conflict with other uses of that space. *Thomas v. Chi. Park Dist.*, 227 F.3d 921, 924 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2002). Again, reasonable time, place, and manner restrictions of speech in traditional public forums are permitted, but they must be content neutral and narrowly tailored to serve a significant government interest, and they must allow ample alternative channels of communication. *Id.*; *see Perry Educ. Ass'n*, 460 U.S. at 45. Restrictions that slip from neutral time, place, and manner concerns into concerns about content are never permitted. *Police Dep't v. Mosley*, 408 U.S. 92, 99 (1972).

*Forsyth County* involved a facial challenge to a county ordinance that permitted an administrator to vary the permit fee for an assembly or parade to reflect estimated administrative expenses and the cost of maintaining public order. 505 U.S. at 127. The Supreme Court held the ordinance unconstitutional because it lacked any

narrow, reasonable, and definite standards to guide the fee determination: "The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice." *Id.* at 133. Further, the ordinance required the fee to be content based. To calculate the cost of maintaining public order, the administrator had to examine the content of the applicant's speech, forecast the response of others to that content, and gauge the number of police officers needed for the event. *Id.* at 134.

The Supreme Court ruled that a permitting scheme for parades or open-air assemblies must meet two requirements: (1) the scheme must not assign overly broad discretion to a government official, and (2) as with other time, place, and manner restrictions, the scheme must be content neutral and narrowly tailored to serve a governmental interest, while leaving ample alternatives for communication. *Id.* at 130. The Court noted that raising revenue to cover police services cannot justify a content-based permit fee, regardless of whether the fee is considered nominal. *Id.* at 135-37.

Although *Forsyth County* involved a facial challenge to an ordinance, its holding applies here; the problems noted in *Forsyth County* are the same problems Carrasco encountered. The deposit imposed on Carrasco was a function of the number of officers assigned to the event, and Biang admitted that he would have assigned fewer police officers to the July 6, 2004, rally if the event had been organized in support of the Towing Ordinance.

Nevertheless, Biang contends his determination was content neutral because his reasoning would apply to any protest, not just a protest against the Towing Ordinance.

*Forsyth County* followed by fifty years the Court's decision in *Cox v. New Hampshire*, 312 U.S. 569 (1941). At issue in *Cox* was a New Hampshire statute that required an applicant for a parade or open-air meeting license to pay up to $300 per day for use of city property. *Id.* at 571 n.1. State courts determined that the fee offset expenses for maintaining public order during the event. *Id.* at 577. The Court held the fee constitutional, finding no basis for denying "local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought." *Id.* Hence, Biang argues that under *Cox*, Waukegan may impose a fee determined by the anticipated expense of maintaining public safety.

After *Forsyth County*, the viability of the fee discussion in *Cox* is limited. *729, Inc. v. Kenton Cnty. Fiscal Court*, 515 F.3d 485, 502 (6th Cir. 2008). *Forsyth County* rejected a party's reference to *Cox* because no evidence indicated that the New Hampshire statute granted unbridled discretion to the licensing authority. 505 U.S. at 133 n.11. Further, although *Cox* stated that a flexible fee to cover expenses may be permissible, *Forsyth County* makes clear that predicating a flexible fee on content is *not* permissible. *See 729, Inc.*, 515 F.3d at 502-03. Although a government's concern over the burden of open-air assemblies on public resources may be legitimate, a cost-based fee may not rest on content. *Church of Am. Knights*

*of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003). The government cannot impose financial burdens on speakers based on the content of their speech. *Rosenberger*, 515 U.S. at 828.

Biang contends that *Forsyth County* applies only to the "heckler's veto" scenario—when counter-protesters are expected to cause trouble. But his reasoning is too narrow; *Forsyth County* applies to any ordinance that allows determination of an event permit fee grounded on content, even if pegged to anticipated administrative expense or the cost of maintaining public order. Justice Blackmun did not limit the scope of the Court's decision to the heckler's veto scenario. Instead, he stated broadly that the Court was addressing whether the right to free speech was violated by an assembly ordinance that allowed a government official power to vary the fee according to the estimated cost of maintaining public order. 505 U.S. at 124.

Here, the undisputed facts show that Carrasco was asked to pay a deposit calculated on the number of officers Biang thought necessary for the contemplated July 6 rally. Biang testified that he took into account that the event was a protest rally. Had the rally been in support of Waukegan's Towing Ordinance, he would have assigned fewer officers. Thus, Biang's application of the Assembly Ordinance fee to Carrasco was impermissibly content based. Raising revenue to cover police services cannot justify a content-based permit fee.

Biang maintains that he did not consider Carrasco's particular viewpoint. However, because he expected

protesters to be angry he concluded that a hostile protest would require more officers. But deciding whether a person is speaking in protest or support of a law always involves consideration of viewpoint, and viewpoint discrimination is "an egregious form of content discrimination," *Rosenberger*, 515 U.S. at 829.

Biang further contends that a municipality must be allowed to vary the number of officers it assigns to events. But assigning officers was not the constitutional violation. Nothing in the present discussion or caselaw suggests that police are not permitted to staff events according to the circumstances. The problem is in issuing permits and charging fees based on the content of the speech at the events; Biang's violation was his involvement in imposing a cash deposit or fee based on the content of Carrasco's speech.

After *Forsyth County* was decided in 1992, a reasonable official was on notice of the clearly established law regarding impermissible, content-based permitting fees. Further, *Brokaw* summarized in 2000 the law regarding an official's participation in a constitutional violation. Thus, by July 2004, a reasonable official should have known that applying the Assembly Ordinance and charging Carrasco a fee based on her protest viewpoint was constitutionally impermissible.

Carrasco claims that Biang applied the Assembly Ordinance to her in retaliation for her prior protests of the Towing Ordinance and to chill her future speech. Retaliation claims and chilling claims are related in that the Constitution protects citizens from penalties that follow

protected speech (retaliation) and threats of penalties for future protected speech (chilling). *Fairley*, 578 F.3d at 525.

For the retaliation claim, the district judge used the burden-shifting test from *Vukadinovich* described above: (1) the speech was constitutionally protected (Carrasco's burden); (2) Biang's actions were motivated by Carrasco's protected speech (Carrasco's burden); and (3) Biang cannot show he would have taken the same action in the absence of Carrasco's exercise of her First Amendment rights (Biang's burden). The judge was mindful that if Biang met his burden on the third element, the burden shifted back to Carrasco to establish that the proffered justifications were pretextual. This test required at step (2) only that the constitutionally protected speech was a motivating factor. Biang's argument that the *Vukadinovich* test was rejected in *Fairley* was addressed above.

Here, the first element of the retaliation claim is undisputed—Carrasco's June 28 speech was protected. Regarding motivation, sufficient evidence establishes an issue of fact, whether under a but-for or motivating-factor causation standard. Biang knew of Carrasco's protected speech at the June 28 march and was told she was planning a larger rally. Just three days after Carrasco's protected speech Biang sent an officer to Carrasco's house and called her in for a meeting at which

the Assembly Ordinance was applied.[3] The temporal proximity between the protected speech and application of the Assembly Ordinance suggests (while it may not establish) a retaliatory connection, but there is more.[4] This application of the Assembly Ordinance to Carrasco was, as the district judge put it, "completely out of the ordinary." Prior to July 1, 2004, the Assembly Ordinance had been applied to no one, even though it could have been applied to applicants for 500 earlier events. Yet, after Carrasco exercised her right to free speech on June 28, the Assembly Ordinance was applied to her next planned rally. Biang offers his reactions to other protest activity by Carrasco as evidence that he did not intentionally retaliate against her. For instance, he saved seats for Carrasco and her group at the July 6 city council

---

[3] Biang at times argues as if the July 1, 2004, meeting alone was his allegedly unconstitutional conduct. The July 1 meeting was not the problem; the application of the Assembly Ordinance at and after the meeting was.

[4] According to Biang, the district court erred in relying on temporal proximity, citing *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Although we have stated several times that suspicious timing alone does not support a reasonable inference of retaliation, the district court was not wrong to consider it in combination with other evidence. *See id.* (noting that "other circumstances must also be present"); *see also Greene*, 660 F.3d at 980 (stating that timing of a conduct report plus the threadbare nature of the report were sufficient to create a triable issue as to whether the report was issued in retaliation).

meeting and at Carrasco's request he appeared at other events. But other conduct that comports with the Constitution does not excuse conduct that violates it.

Whether Biang would have taken the same action absent Carrasco's protest on June 28 is a question of fact. Biang may have had safety concerns about a large rally protesting the Towing Ordinance, but the unprecedented application of the Assembly Ordinance to Carrasco three days after her protected speech cannot be ignored. A reasonable jury could find in Carrasco's favor on this point.

Nevertheless, Biang would enjoy qualified immunity as to this claim if applicable law was not clearly established as of July 1, 2004. However, by then it was clear that Biang could not retaliate against a person for protected First Amendment speech. For these reasons, determination of Biang's qualified immunity defense must await presentation of the facts at trial.

Finally, we turn to Carrasco's chilling claim. The First Amendment prohibits threats of punishment designed to discourage future protected speech. *Fairley*, 578 F.3d at 525. We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity. *Id.*; *see Garcia v. City of Trenton*, 348 F.3d 726, 728-29 (8th Cir. 2003). Again, Carrasco must show that her potential speech was at least a motivating cause of Biang's threat of punishment. *See Greene*, 660 F.3d at 978-79; *Fairley*, 578 F.3d at 525-26. Would a person of ordinary firmness be deterred from

holding a rally if called to a meeting by a uniformed officer and told by the police chief and city attorney that the never-used Assembly Ordinance would be enforced, a $1500 permit fee had to be paid, and failure to comply with the Assembly Ordinance would result in a violation of law and denial of future permit applications? Taking the facts in Carrasco's favor, especially in light of the selective nature of the Assembly Ordinance's application, a reasonable jury could answer "yes." Further, a reasonable jury could find that prohibiting Carrasco's speech was the motivating, or even but-for, cause of Biang's threats. At trial, Biang could contend that he was truly concerned about police expense, but the selective nature of the application of the ordinance suggests the contrary.

Biang contends that Carrasco's speech was not actually chilled. Moreover, chilling claims require damages. *Fairley*, 578 F.3d at 526. Here, there appears to be evidence that Carrasco was not planning a rally on July 6, and that she was able to protest the Towing Ordinance in other ways. But whether she was planning a rally on July 6 and chose not to proceed with it due to the threatened permit fee is a question of fact, as is whether she altered her means of protesting after learning that the Assembly Ordinance would apply to her protests. Notably, Neddenriep's letter warned that advance notice would not be waived for future permit applications. Perhaps, as a result, Carrasco foreswore future outdoor assemblies because of the threat. "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their

constitutional rights it need not be great in order to be actionable." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

Regarding qualified immunity, Biang was on notice before July 2004 that prior restraints on speech are prohibited. While *Fairley*, in 2009, discussed confusion in use of the word "retaliation" to describe penalties for past speech (retaliation) and threats to deter future speech (chilling), prior restraints have been recognized for many years as forbidden and "quintessential first-amendment violation[s]." *See Fairley*, 578 F.3d at 525 (citing Supreme Court cases from 1976, 1975, and 1919).

### C. Blanks's Claims Against Police Chief Biang

Like Carrasco, Blanks raises (1) an as-applied claim regarding use of the Assembly Ordinance; (2) a retaliation claim; and (3) a chilling claim. His assertions stem from his planned September 4, 2004, protest at Bedrosian Park.

In a response similar to that regarding Carrasco's claim, Biang contends that he did not participate in any unconstitutional conduct because Neddenriep applied the Assembly Ordinance to Blanks, not he; according to Biang, he had no personal involvement. On this point, Biang succeeds.

Blanks contends that Biang did not adequately raise qualified immunity and the district court addressed qualified immunity only as to Blanks's retaliation and chilling claims. Qualified immunity pertaining to Blanks's claims first surfaced in Biang's reply brief on summary judgment. Moreover, it was fleeting—just one

sentence accusing Blanks of failing to produce evidence of Biang's intent to retaliate or chill speech. However, Biang's failure to discuss qualified immunity respecting Blanks's as-applied claim appears due to Blanks's failure to clarify that he was bringing such a claim. The Third Amended Complaint named only Waukegan and clerk Wayne Motley as defendants for Blanks's as-applied claim. Biang was named only in regard to the retaliation and chilling claims.

The district court addressed the qualified immunity issue, though briefly, and did not limit qualified immunity to the retaliation and chilling claims. Instead, Judge Shadur discussed qualified immunity as to Biang's overall liability. Hence, we will not find the qualified immunity issue waived when the district court did not.

Biang's involvement in the application of the Assembly Ordinance to Blanks was insufficient to support § 1983 liability. He may have told Yancey to handle the matter and check with Neddenriep about whether the Assembly Ordinance applied to a rally in Bedrosian Park, but that was not enough to find that Biang participated in applying the Assembly Ordinance to Blanks. Biang did not attend a meeting with Blanks during which application of the Assembly Ordinance to the September 4 event was discussed nor did he participate in determining any permit fee. Neddenriep, not Biang, applied the Assembly Ordinance. Moreover, Biang merely received a copy of the letter Neddenriep sent to Blanks, which no reasonable jury could conclude is proof of personal involvement. The record includes nothing showing that

Biang knew or reasonably should have known that Neddenriep would deprive Blanks of his constitutional rights.

The district judge thought Biang's instruction to Yancey to handle the matter was enough of a causal connection or affirmative link, but we disagree. Thus, summary judgment against Blanks is warranted on the first element of the qualified immunity defense. Further, under the law as of 2004 regarding personal involvement, which required direction or setting an event in motion, *see Brokaw*, 235 F.3d at 1012, a reasonable official in Biang's position would not have known that his direction to Yancey and failure to act upon receipt of Neddenriep's letter would have violated the Constitution.

### III

For the above-discussed reasons, we AFFIRM the denial of qualified immunity regarding the claims of Surita and Carrasco, REVERSE the denial of qualified immunity as to Blanks's claims, and REMAND the case for further proceedings consistent with this opinion.

MANION, *Circuit Judge*, concurring in part, dissenting in part. I concur with the court's conclusion that qualified immunity should be denied to Mayor Hyde on plaintiff Surita's claim, and that qualified immunity should be accorded to Police Chief Biang on plaintiff Blanks's claim. But I disagree with the court's conclusion that Biang was "personally involved in the application of the Assembly Ordinance" against plaintiff Carrasco. (Opinion at 23.) The record evidence does not support this conclusion. Because there is no evidence that Biang was personally involved in the violation of Carrasco's constitutional rights, he is entitled to qualified immunity. Therefore, I concur in part and dissent in part.

As the court notes, Carrasco advanced three free-speech claims against Police Chief Biang: (1) that Biang applied the Assembly Ordinance in a discriminatory fashion; (2) that Biang applied the Assembly Ordinance in retaliation against Carrasco; and (3) that Biang applied the Assembly Ordinance to chill Carrasco's future speech. (Opinion at 22-23.) The common thread that runs through these claims is Biang's alleged improper application of the Assembly Ordinance against Carrasco. If so, it is Biang's application of the Assembly Ordinance that allegedly caused a violation of Carrasco's constitutional rights.

When determining qualified immunity in this instance, we need to examine whether Biang actually caused a violation of Carrasco's constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). As the court correctly states, "[a]n official causes a constitu-

tional violation if he sets in motion a series of events that [he] knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1012 (7th Cir. 2000) (citation omitted). The court concludes that Biang caused a violation of Carrasco's constitutional rights by organizing a meeting with city attorney Gretchen Neddenriep, by sending a deputy to Carrasco's house to ask her to attend that meeting, and by calculating the number of officers that would be needed to patrol Carrasco's planned protest. (Opinion at 23.) This limited recitation of the facts leads the court to an erroneous conclusion.

Biang did initiate a meeting with Carrasco after he received word that Carrasco was planning a protest rally outside city hall that would coincide with a city council meeting. And a uniformed police officer did show up at Carrasco's door to invite her to come to the meeting—but only after a call to Carrasco's home had gone unanswered. As for the purpose of the meeting, the record also clearly shows that Biang's aim was "[t]o establish ground rules for where people were going to be [during the protest]." Aware that there were likely "First Amendment issues" surrounding the city's response to Carrasco's protest, Biang also invited Neddenriep so that she could cover any legal issues. Biang averred that, at the time he called for the meeting, he was not aware of any enforcement action that might be taken against Carrasco for not complying with the Assembly Ordinance. At the meeting, it is undisputed that Neddenriep provided

Carrasco with a copy of the Assembly Ordinance and went through the permitting and fee requirements. Indeed, Carrasco herself stated that Neddenriep did most of the talking during the meeting and that Biang's comments were limited to logistics and public safety concerns. This testimony corroborates Biang's contention that it was Neddenriep, not the police department, who decided to apply the Assembly Ordinance.

With this additional factual background, it is apparent that Neddenriep, not Biang, set in motion a series of events that she knew or reasonably should have known would cause others to deprive Carrasco of her constitutional rights. The undisputed evidence demonstrates that Biang called the meeting out of a concern for public safety, and that Biang's estimate of the number of police officers who were needed to patrol the protest was likewise made out of a concern for public safety.[1] Moreover, Biang summoned Carrasco to the meeting with a uniformed officer only after the police had attempted to contact Carrasco via telephone. Most convincingly, Biang's unopposed testimony shows that he

---

[1] The court acknowledges that varying the number of officers assigned to different events does not violate the Constitution. (Opinion at 28.) The court concludes that Biang's violation was in calculating the permitting fees. But it is undisputed that Neddenriep, not Biang, provided Carrasco with the total fee amount. Therefore, by the court's own reasoning, Biang did not effect a constitutional violation by giving Neddenriep an estimate of the number of police officers needed to patrol the protest.

had no idea that Neddenriep would seek to impose the Assembly Ordinance's requirements on Carrasco.

Additionally, the court emphasizes the fact that, before the meeting with Carrasco, the Assembly Ordinance had never been applied despite the fact that more than 500 applications had been filed previously. (Opinion at 30.) But this fact actually cuts in favor of Biang. Indeed, because the city had never applied the Assembly Ordinance, Biang could not have known—nor could he have reasonably foreseen—at the time he called the meeting that Neddenriep would apply the Assembly Ordinance to Carrasco.

That said, for whatever reason, Carrasco did not name Neddenriep as a defendant. The uncontroverted testimony in this case points to Neddenriep as the official responsible for applying the Assembly Ordinance against Carrasco. Because no reasonable fact finder could conclude that Biang did anything that he knew or should have known would result in a violation of Carrasco's constitutional rights, I would reverse the district court and hold that qualified immunity applies to Carrasco's claims against Biang. Accordingly, I dissent.