In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 13-3343, 13-3346 & 13-3347

ROBERT LEE STINSON,

*Plaintiff-Appellee,*

*v.*

JAMES GAUGER, LOWELL T. JOHNSON,
and RAYMOND RAWSON,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 09 CV 1033 — **Charles N. Clevert, Jr.**, *Judge.*

———————————

ARGUED JUNE 6, 2014 — DECIDED AUGUST 25, 2015

REARGUED EN BANC FEBRUARY 9, 2016

DECIDED AUGUST 18, 2017

———————————

Before WOOD, *Chief Judge,* and BAUER, POSNER, FLAUM,
EASTERBROOK, MANION, KANNE, ROVNER, WILLIAMS, SYKES,
and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge*. Robert Stinson spent twenty-three years in jail for a murder he did not commit. No eyewitness testimony or fingerprints connected him to the murder. Two dentists testified as experts that Stinson's dentition matched the teeth marks on the victim's body, and a jury found Stinson guilty. After DNA evidence helped exonerate Stinson, he filed this civil suit against the lead detective and the two dentists alleging that they violated due process by fabricating the expert opinions and failing to disclose their agreement to fabricate. The district court denied the defendants' motions for summary judgment seeking qualified immunity after finding that sufficient evidence existed for Stinson to prevail on his claims at trial.

We conclude that we lack jurisdiction to hear the defendants' appeals of the denial of qualified immunity because those appeals fail to take the facts and reasonable inferences from the record in the light most favorable to Stinson and challenge the sufficiency of the evidence on questions of fact. As a consequence, *Johnson v. Jones*, 515 U.S. 304 (1995) precludes interlocutory review. We do have jurisdiction to consider the district court's denial of absolute immunity to Johnson and Rawson. That denial was correct because Stinson's claims focus on their conduct while the murder was being investigated, not on their trial testimony or trial testimony preparation.

## I. BACKGROUND

As this is an appeal from a ruling on summary judgment, the chronology that follows takes the facts in the light most favorable to Stinson as the non-moving party at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ione Cychosz was murdered in Milwaukee, Wisconsin

on November 3, 1984. Sixty photographs were taken of her body at the county medical examiner's office, including pictures of bite marks to her body. An assistant deputy medical examiner authorized the use of Dr. Lowell Johnson as a forensic odontology (the scientific study of teeth) consultant, and Johnson examined the bite marks on Cychosz's body. He identified eight complete or partial bite marks and took rubber impressions of the bite marks on Cychosz's right breast. Two days later he returned to the medical examiner's office to extract tissue from her right breast.

James Gauger and Tom Jackelen were assigned as the lead detectives to investigate Cychosz's murder. Before heading to the crime scene, Gauger reviewed the case file that had been assembled in the two to three days after the murder. According to Stinson's version of the events, and before Gauger and Jackelen's first visit to the crime scene on November 6, 1984, the two detectives met with Johnson. At that meeting, Johnson showed the detectives photos of the bite marks and a drawing he had made of the assailant's teeth. Johnson told the detectives the assailant was missing the tooth depicted in his sketch, a lateral incisor (a tooth one over from the upper front teeth). There is no police report memorializing any meeting between Johnson and either detective before November 15.

On November 6, Gauger and Jackelen went to the area where Cychosz's body was found to interview neighbors, and they visited the nearby home where Stinson lived. Jackelen questioned Stinson while Gauger interviewed Stinson's brother. Stinson is missing his right central incisor, or what is more commonly called the upper right front tooth. On Stinson, this tooth is fractured and decayed almost to the gum line.

After they finished their interviews, the two detectives met at the front of the house, and Jackelen told Gauger, "We have him." The detectives then went back to speak with Stinson and intentionally said something to make Stinson laugh so that his teeth would be visible. When Gauger saw that Stinson had a missing upper front tooth, he thought, according to his later memoir, *The Memo Book*, published long after Stinson's conviction, "There it was. The broken front tooth and the twisted tooth just like on the diagram and pictures." (At his deposition in this case, however, Gauger said that the missing tooth was on the upper right side and to the right of the front tooth.)

This was the not first time Gauger and Jackelen had questioned Stinson regarding a murder. Two years earlier, a man named Ricky Johnson was shot and killed during an attempted robbery, and Gauger and Jackelen were assigned to the case. Stinson told the detectives he had no information regarding who killed Ricky Johnson, and the detectives responded that they were "tired of all that bull**** story you telling." No charges were ever filed in the case, but Gauger wrote in *The Memo Book* that he believed Stinson and his friends murdered Ricky Johnson. Writing about the case in his memoir, Gauger said "[l]ots of people get away with murder" and maintained the case was still open "because we had the right guys, but couldn't prove it."

After the interview of Stinson at his home, the detectives met with prosecutors including Assistant District Attorney Dan Blinka. Blinka thought there was not sufficient evidence at that point to obtain a search warrant to examine Stinson's dentition. Blinka called Johnson during the meeting and asked whether Johnson could make an identification from the

bite marks on the body, and Johnson replied that under the right conditions he could, if he had a full make-up of the suspect's dentition.

On November 15, 1984, Gauger and Jackelen met with Johnson. The November 15 police report states that Johnson said the offender would have a missing or broken right central incisor (i.e., the upper right front tooth). That is the same tooth that the detectives had observed that Stinson was missing when they questioned him.

The next day, the detectives interviewed and photographed two other men with at least one missing or broken tooth. Johnson ruled them out as suspects in Cychosz's murder based only on looking at the photographs. Stinson's odontological expert in the current case, Dr. Michael Bowers, states there was no scientific basis for Johnson to exclude these two men by just looking at photographs.

At some point, a police sketch artist made a second sketch of the assailant's dentition. Johnson says he told the artist a tooth in the upper quadrant was missing but did not specify which one. The police artist used Johnson's initial sketch to make the police sketch. Consistent with Stinson's theory of Johnson's initial sketch, the police sketch reflects a missing or broken upper tooth that is not the upper right front tooth. Johnson says he did not use the police artist's sketch at any point after it was created.

On December 3, 1984, Stinson appeared in a Wisconsin state court "John Doe hearing" pursuant to subpoena as a person who might have knowledge or information bearing on an investigation. During this hearing, Jackelen testified that he observed that Stinson had missing and crooked front teeth

consistent with the information he had received from Johnson. Johnson inspected Stinson's teeth at the hearing for fifteen to twenty seconds. Johnson asked for his sketch of the perpetrator's dentition, but Jackelen said he did not have a copy with him. Johnson then testified it was "remarkable" how similar Stinson's teeth were to the sketch and said that Stinson's teeth were consistent with what he expected from the assailant after his analysis of the bite marks. The judge then ordered Stinson to submit to a detailed dental examination, including the creation of wax molds of his teeth and photographs of his teeth, which he did.

Later, Johnson compared the molds and photographs of Stinson's teeth and the wax exemplars of Stinson's bite with the bite mark evidence from Cychosz's body, and he opined that Stinson's teeth were identical to those that caused the bite marks. Johnson conveyed that opinion to Gauger, Jackelen, and Blinka. Blinka met with Johnson and one or both of Gauger and Jackelen to review the evidence, and Johnson said that Stinson's dentition was consistent with that of the person who inflicted the bite marks on Cychosz.

However, that did not satisfy Blinka. He would not approve charges against Stinson without a second opinion from a forensic odontologist. So Johnson contacted Dr. Raymond Rawson about the case, with Johnson telling Gauger that he "wanted the best forensic odontologist in the United States to confirm his findings." Rawson had a private dental practice in Las Vegas, served as a forensic odontologist since 1976 and was a diplomat of the American Board of Forensic Odontology.

Johnson had also been a diplomat of the American Board of Forensic Odontology, and the two were friends and had

known each other for at least seven years. On January 17, 1985, Gauger and Jackelen hand-delivered evidence, including Cychosz's preserved skin tissue and the dental molds and models of Stinson that Johnson had generated, to Rawson in Las Vegas. Rawson reviewed the evidence for one to three hours in Gauger's hotel room and verbally confirmed Johnson's findings, saying he was impressed with the amount of evidence. Gauger recalled that Rawson looked at the x-rays and molds and said that was enough for him and that he concurred with Johnson.

A few days later, on January 21, 1985, a criminal complaint was issued that charged Stinson with the first-degree murder of Cychosz. Before trial, Johnson authored an expert report setting forth his opinions, including that "to a reasonable degree of scientific certainty … the teeth of Robert Lee Stinson would be expected to produce bite patterns identical to those which [Johnson] examined and recorded in this extensive analysis." Rawson prepared a one-page expert report that summarized his opinions. After reviewing the materials Johnson generated, Rawson stated he agreed with Johnson's conclusion that Stinson caused the bite mark injuries to Cychosz.

Stinson's trial took place in December 1985. The prosecution did not offer any evidence of motive, nor did it produce any eyewitness testimony that connected Stinson to Cychosz's murder. Some testimony suggested that Stinson had given conflicting versions of his whereabouts on the night of Cychosz's death. Stinson's counsel moved to exclude any forensic odontology evidence from trial, but that request was denied. Johnson testified at trial that the bite marks on Cychosz must have been made by teeth identical in relevant character-

istics to those that Johnson examined on Stinson. Rawson testified that Johnson performed "a very good work-up" and that he agreed with Johnson's conclusion to a reasonable degree of scientific certainty that Stinson caused the bite marks on Cychosz's body.

No contrary expert was offered by the defense at trial. (Stinson's counsel had hired an odontology expert but did not call him at trial.) The jury convicted Stinson of murder, and he received a sentence of life imprisonment. After the trial, Johnson used the Cychosz bite mark evidence for teaching and career-furthering purposes.

More than twenty-three years after Stinson's conviction, a panel of four forensic odontologists reanalyzed the bite mark evidence and concluded that Stinson could not have made the bite marks found on Cychosz. DNA testing of blood found on Cychosz's clothing also excluded Stinson. Stinson's conviction was vacated on January 30, 2009, and he was released from prison. The State of Wisconsin dismissed all charges against him that July. In April 2010, the Wisconsin State Crime DNA Database matched the DNA profile of the blood found on Cychosz's clothing with that of a convicted felon, Moses Price. Price later pled guilty to Cychosz's murder.

Stinson filed the present suit under 42 U.S.C. § 1983 against, as relevant here, Gauger, Johnson, and Rawson. (Jackelen has passed away.) Stinson's expert in this case, Dr. Bowers, reviewed the bite mark evidence and concluded that the bite marks found on Cychosz excluded Stinson. Consistent with the panel, Bowers concluded that Johnson's and Rawson's explanations of why a bite mark appeared on Cychosz's body where Stinson has a missing tooth has "no empirical or scientific basis and does not account for the absence

of any marks by the adjacent, fully developed teeth." Bowers believed that the methods Johnson and Rawson used "were flawed and did not comport with the accepted standards of practice in the field of forensic odontology at the time." Bowers concluded that "to a reasonable degree of scientific certainty as a forensic odontologist … Johnson and Rawson knowingly manipulated the bite mark evidence and Stinson's dentition to appear to 'match' when there was in fact no correlation between Stinson's teeth and the bite marks inflicted on Cychosz's body."

Gauger, Johnson, and Rawson moved for summary judgment on immunity grounds. The district court ruled that Johnson and Rawson were not entitled to absolute immunity. All three defendants asserted qualified immunity. Regarding the due process claim of fabrication of evidence, the district court concluded that "Stinson has sufficient evidence to get to trial" and explained its conclusion that sufficient evidence in the record existed. The district court also stated that qualified immunity did not apply because the law as of 1984 and 1985 clearly established that an investigator's fabrication of evidence violated a criminal defendant's constitutional rights. As for Stinson's claim of failure to disclose pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), that the opinions were fabricated, the district court ruled that there was enough evidence to go to a factfinder on this claim as well. The court also stated that it was clearly established by 1984 that the withholding of information about fabricated evidence constituted a due process violation, citing among others our decision in *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012).

Gauger, Johnson, and Rawson appealed. A panel of our court concluded that the defendants were not entitled to absolute immunity, that we had jurisdiction to consider appeals of the denial of qualified immunity at summary judgment, and that the defendants were entitled to qualified immunity. We granted rehearing en banc.

## II. ANALYSIS

Our threshold question in any appeal is whether we have jurisdiction to hear the case. Congress has granted us jurisdiction over appeals from "final decisions" of the district courts. 28 U.S.C. § 1291. An order denying a motion for summary judgment is usually not a final decision within the meaning of § 1291 and so is not generally immediately appealable. *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011).

Even if it is not the last order in a case, a district court decision is "final" within the meaning of § 1291 if it is within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). An appeal from the denial of a claim of absolute immunity is one such order that is appealable before final judgment. *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985).

### A. No Jurisdiction to Determine Qualified Immunity Appeal

Our case involves both the denial of claims of absolute immunity as well as the denial of claims of qualified immunity. Qualified immunity protects government officials from civil

damages liability when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit and not just a defense to liability. *Mitchell*, 472 U.S. at 526.

"[D]eterminations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case." *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). The Supreme Court ruled in *Mitchell* that, "to the extent that it turns on an issue of law," a defendant may take an immediate appeal of a decision denying him qualified immunity at summary judgment. 472 U.S. at 530. Later, in the case at the heart of this appeal, the Supreme Court addressed appeals from the denial of qualified immunity at summary judgment when the denial is based on a factual dispute rather than a legal question. *See Johnson v. Jones*, 515 U.S. 304 (1995). For such cases, the Supreme Court made it clear: "we hold that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319-20. The defendants here, invoking a qualified immunity defense, seek to appeal the district court's summary judgment order that concluded the pretrial record set forth a genuine issue of fact for trial. While *Johnson* might seem to end matters, we examine whether any subsequent Supreme Court decisions limit *Johnson*'s reach.

The first post-*Johnson* case to which we turn is *Scott v. Harris*, 550 U.S. 372 (2007). Like *Johnson*, *Harris* involved the defendant's appeal of the denial of a motion for summary judgment on the basis of qualified immunity in an excessive force

case. In upholding the denial of the motion, the Supreme Court recognized that the district court had stated there were material issues of fact on which the qualified immunity decision turned. *See id.* at 376. Nonetheless, the Supreme Court addressed the appeal on the merits.[1] In light of a videotape that recorded the sequence of events and that "blatantly contradicted" the plaintiff's account, the Court concluded the defendant officer's actions were reasonable and did not violate the Fourth Amendment and that no reasonable jury could decide otherwise. *Id.* at 380, 386. As a result, the defendant officer was entitled to summary judgment. *Id.* at 386.

The Supreme Court's decision in *Harris* does not mention *Johnson,* so it was not overruling *Johnson*. The Court's silence came despite the *Harris* respondent's argument to the Court that it lacked jurisdiction because of *Johnson. See* Brief for Respondent at 1-3, *Scott v. Harris*, 550 U.S. 372 (2007) (No. 05-1631), 2007 WL 118977, at *1-3. There was no need for the Court to mention *Johnson*, though, because *Johnson* and *Harris* are consistent. The events in *Harris* were captured on videotape, and the question on appeal was the constitutionality of the officer's conduct in light of the facts depicted on the unchallenged videotape. So review was of the district court's decision on an issue of law, not of whether there was a genuine issue of fact for trial.

Seven years later, the Supreme Court decided *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014). There the district court denied

---

[1] The Eleventh Circuit rejected the plaintiff's argument that it lacked jurisdiction over the appeal, stating simply that the "appeal goes beyond the evidentiary sufficiency of the district court's decision." *Harris v. Coweta Cty., Ga.*, 433 F.3d 807, 811 n.3 (11th Cir. 2005), *rev'd sub nom. Scott v. Harris*, 550 U.S. 372 (2007).

the defendant officers' motion for summary judgment on the basis of qualified immunity, ruling that the officers' conduct violated the Fourth Amendment and was contrary to clearly established law. *See id.* at 2018. Again, unsurprisingly, the Supreme Court decided the legal question of whether there was excessive force and did not dismiss the case for lack of jurisdiction. The Court explained:

> The District Court order in this case is nothing like the order in *Johnson*. Petitioners do not claim that other officers were responsible for shooting Rickard; rather, they contend that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law. Thus, they raise legal issues; these issues are quite different from any purely factual issues that the trial court might confront if the case were tried; deciding legal issues of this sort is a core responsibility of appellate courts, and requiring appellate courts to decide such issues is not an undue burden.

*Id.* at 2019. The Court proceeded to decide the case on the merits. *Id.* at 2020. *Plumhoff* too is consistent with *Johnson*. As in *Harris*, the Court decided a purely legal issue, not a question of evidentiary sufficiency. The Court did the same thing when it considered an interlocutory qualified immunity appeal in *Mullenix v. Luna*, 136 S. Ct. 305 (2015) on the question of law of whether the defendants used excessive force.

No Supreme Court decision has criticized *Johnson*; to the contrary, the Court continues to rely on it post-*Harris*. *See Plumhoff*, 134 S. Ct. at 2018–19; *Ashcroft v. Iqbal*, 556 U.S. 662, 671, 673–74 (2009); *Ortiz v. Jordan*, 562 U.S. 180, 188–91 (2011).

Nor has the Court disavowed its pre-*Harris* reliance on *Johnson* in multiple cases. *See Behrens v. Pelletier*, 516 U.S. 299, 306, 312–13 (1996); *Johnson v. Fankell*, 520 U.S. 911, 922 (1997); *Crawford-El v. Britton*, 523 U.S. 574, 595, 597 n.18 (1998); *Richardson v. McKnight*, 521 U.S. 399, 402 (1997).

*Johnson* very much remains the law. As a result, we must adhere to the distinction it draws between appeals from denial of summary judgment qualified immunity rulings based on evidentiary sufficiency and those "presenting more abstract issues of law." *Johnson*, 515 U.S. at 317. If what is at issue in the sufficiency determination is whether the evidence could support a finding that particular conduct occurred, "the question decided is not truly 'separable' from the plaintiff's claim, and hence there is no 'final decision' under *Cohen* and *Mitchell*." *Behrens*, 516 U.S. at 313. So appeal is possible only if "the issue appealed concern[s], not which facts the parties might be able to prove, but, rather, whether or not certain given facts show[] a violation of 'clearly established' law." *Johnson*, 515 U.S. at 311 (citing *Mitchell*, 472 U.S. at 528). *Johnson*'s distinction between appeals of evidentiary sufficiency determinations and those of legal issues also makes practical sense, as the principle helps keep qualified immunity interlocutory appeals within reasonable bounds.

Our basic question in determining whether we have jurisdiction over this appeal, then, is whether our case is one of evidentiary sufficiency or one of a question of law. Stinson maintained in this suit that Gauger, Johnson, and Rawson violated his due process right to a fair trial by: (1) fabricating the principal evidence of his guilt (the opinions that his dentition matched the bite marks on Cychosz), and (2) failing to disclose, as required by *Brady*, the defendants' agreement to

fabricate this opinion evidence. (He also brought failure to intervene and conspiracy claims that were predicated on these two claims.). In ruling on the fabrication of evidence claim, the district court reviewed the evidence presented in the summary judgment materials and concluded that Stinson had sufficient evidence to get to trial. Regarding the *Brady* theory, the district court concluded that "there are credibility questions that preclude summary judgment" and so "in this case the jury will have to decide whether Gauger, Jackelen, and Johnson, and then Rawson, impliedly agreed that the odontologists would opine that Stinson's dentition matched the bite marks." *Stinson v. City of Milwaukee*, No. 09 C 1033, 2013 WL 5447916, at *20 (E.D. Wis. Sept. 30, 2013). More particularly, the district court stated:

> The evidence in the record about Johnson's shift regarding which tooth was missing after the detectives thought they had their man, the lack of a sketch at the John Doe hearing, Johnson's call to Rawson, Rawson's extremely brief initial review of the physical evidence in Las Vegas, and the existence of gross errors in Johnson's and Rawson's review of the physical evidence (which another expert says could not be honestly made) provides enough to allow Stinson to get Johnson, Rawson, and Gauger before the jury for evaluation.

*Id.*

On appeal, the defendants assert that they are crediting Stinson's account and asking only for a legal determination of whether Stinson's version of the facts means they violated a clearly established constitutional right. Accepting a plaintiff's version of the facts in the summary judgment record can help

allow us to consider a defendant's legal arguments in a qualified immunity appeal. *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011). Here, however, the premise of the defendants' assertion is not true; rather, the defendants fail to take as true Stinson's version of the facts, and they fail to do so on significant matters. We have explained that if "we detect a backdoor effort to contest the facts, we will reject it and dismiss the appeal for want of jurisdiction." *Id.*; *see also id.* ("[A]n appeal from a denial of qualified immunity cannot be used as an early way to test the sufficiency of the evidence to reach the trier of fact. In such a case, where there really is no legal question, we will dismiss for lack of jurisdiction."). Said another way, "an appellant challenging a district court's denial of qualified immunity effectively pleads himself out of court by interposing disputed factual issues in his argument." *Gutierrez v. Kermon*, 722 F.3d 1003, 1010 (7th Cir. 2013).

A significant factual dispute at summary judgment was whether Johnson met with Gauger and Jackelen before the detectives interviewed Stinson on November 6, 1984. Related to that was whether, if such a meeting took place, Johnson gave or showed the detectives a sketch at that meeting. The district court concluded that viewing the submitted evidence in the light most favorable to Stinson, such a meeting did take place, and that during the pre-interview meeting Johnson showed the detectives a sketch of the assailant's dentition reflecting a missing tooth to the right of the central incisor. This pre-interview meeting is critical because, if it happened, it showed that Johnson changed his analysis after the detectives interviewed Stinson. Although under Stinson's version the original sketch showed a missing tooth to the *right* of the central incisor, after the detectives interviewed Stinson and met with Johnson on November 15, Johnson changed his analysis and said that the

assailant was missing the right central incisor, i.e., the right *front* tooth, which is the same tooth the detectives had observed missing on Stinson. Johnson had not done any analysis of the bite marks between November 6 and 15 that would explain this change.

The pre-interview meeting is critical to Stinson's theory that the defendants fabricated evidence and failed to disclose *Brady* material, but the defendants do not credit that the meeting took place in their briefs to us. To the contrary, after quoting Gauger's account of visiting Stinson for the first time including that the detectives knew they were looking for someone with a missing tooth and a twisted tooth, Gauger's brief asserts, "but since there is no report of any meeting with Dr. Johnson prior to this interview, it is not possible that it came from any meeting with the doctor." *See* Opening Brief for the Respondent Gauger at 6, *Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015) (Nos. 13-3343, 13-3346, 13-3347). Johnson's and Rawson's briefs omit the November 6 pre-interview meeting, despite the centrality of it to the district court's analysis and Stinson's fabrication and *Brady* claims.

Who made the first call to Rawson is another dispute of historical fact. The district court concluded that, viewing the evidence in the light most favorable to Stinson, Johnson made the first contact with Rawson. That Johnson made the first contact was significant to the district court's analysis because the call allowed Johnson to tell Rawson the "desired result" Rawson should reach. *Stinson*, 2013 WL 5447916, at *19. This call was also central to the district court's determination that Rawson was part of the conspiracy. Gauger, however, states on appeal, again in contradiction to the district court's view of the evidence, that Blinka was the one who first contacted

and focused on Rawson. *See* Gauger Opening Br. at 19. Johnson's and Rawson's briefs do not even acknowledge that they ever communicated with each other.

So despite their statements to the contrary, the defendants on appeal have not asked us to view the record in the light most favorable to Stinson. That means that although they try to suggest otherwise, the defendants are not asking us for review of an abstract question of law, but rather they seek a reassessment of the district court's conclusion that sufficient evidence existed for Stinson to go to trial. *See Jones*, 630 F.3d at 680; *Gutierrez*, 722 F.3d at 1010-11, 1014 (dismissing appeal for lack of jurisdiction where qualified immunity argument depended upon disputed fact).

The nature of the defendants' appeals further demonstrates that they do not present the requisite abstract questions of law. Johnson and Rawson maintain they did not intentionally fabricate their opinions and so did not fail to turn over *Brady* material. But whether their opinions were intentionally fabricated or honestly mistaken is a question of fact, not a question of law. *Johnson* itself explains that we lack jurisdiction over factual questions about whether there is sufficient evidence of intent:

> For another thing, questions about whether or not a record demonstrates a "genuine" issue of fact for trial, if appealable, can consume inordinate amounts of appellate time. Many constitutional tort cases, unlike the simple "we didn't do it" case before us, involve factual controversies about, for example, intent—controversies that, before trial, may seem nebulous. To resolve those controversies—to determine whether there is or is not a triable issue of fact about such a matter—may

> require reading a vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials. This fact means, compared with *Mitchell,* greater delay.

*Johnson*, 515 U.S. at 316; *see also Ortiz*, 562 U.S. at 190 (stating defendants' claims of qualified immunity did not present purely legal issues and that "[c]ases fitting that [legal issue] bill typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law.").

The district court concluded that the evidence in the record meant that a reasonable jury could find that Johnson and Rawson fabricated their opinions. The district court recounted that, taking the record in the light most favorable to Stinson, Johnson altered the missing tooth identification only after meeting with the detectives, after they interviewed Stinson and observed his dentition. Johnson did not have any new information before making the switch, and he has never said the change was a matter of reevaluation. The district court also stated Johnson and Rawson had to have known that Stinson was excluded from causing the bite marks because of obvious differences between Stinson's teeth and the bite mark patterns. Bowers, Stinson's expert in the current case, opined that Johnson and Rawson knowingly manipulated the bite mark evidence and Stinson's dentition to make them appear to match. Both the four-odontologist panel and Bowers found no empirical or scientific basis for finding a bite mark on Cychosz's body where Stinson has a missing tooth. They also found inexplicable Johnson's and Rawson's conclusion that Stinson's upper second molars made a bite mark because mo-

lars are located so far back in the mouth. And if Stinson's version of the facts is accepted, there was also a cover up of the switch in tooth identification, as no police report accounts for it. From all of this evidence, the district court concluded there was sufficient evidence for a factfinder to draw an inference that the defendants were lying.

We add a bit more about Rawson, who argues that he was too far removed from any misconduct and so should receive qualified immunity. As he emphasizes, he was not involved in the November meetings between the detectives and Johnson or in Johnson's initial analysis. The district court found sufficient evidence in the record of Rawson's liability, noting that it was Johnson who first called Rawson, that when he did Johnson phrased the "second opinion" request as a request for confirmation of Johnson's opinion, and that Bowers stated that confirmation could not be made with such a short review. The district court also reasoned that a factfinder could find that Rawson complied, as supported by the short amount of time it took him to confirm Johnson's findings in a Las Vegas hotel room and to state he concurred with Johnson. Whether the evidence was sufficient for a factfinder to find the requisite intent to fabricate is beyond the scope of our interlocutory review.

Intent is, after all, most often proven circumstantially. *See, e.g., Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (stating that a meeting of minds "may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts"); *United States v. Nocar*, 497 F.2d 719, 725 (7th Cir. 1974) ("As courts have frequently pointed out, knowledge and intent must often be proven by circumstantial evidence.").

Rarely will there be an admission of subjective intent. The intent to fabricate is a question of fact that the district court concluded could be inferred in Stinson's favor by the evidence in the record at summary judgment, and the defendants' challenge to whether that is true is the type of appeal forbidden by *Johnson.*

Whether Gauger knew that Johnson and Rawson fabricated their opinions that the bite mark evidence matched Stinson's dentition was a related, and important, factual dispute at summary judgment. Gauger argued that because he is not a dentist, he cannot be blamed for Johnson's and Rawson's expert conclusions. The district court determined that taking the facts in Stinson's favor, "Gauger was cognizant of Johnson's shifting view of which tooth was missing" and "was fully aware" of the "contents of his conversations with Johnson and what he implied in their second meeting, following his and Jackelen's interview of Stinson," namely that Gauger implied a desired result in the expert opinions. *Stinson*, 2013 WL 5447916, at *20. But on appeal, Gauger argues that the evidence in the record does not support a conclusion that Gauger knew the dentists were producing false opinions. *See* Gauger Opening Br. at 25-28, 40. This challenge to the sufficiency of the evidence is again precluded by *Johnson.*

We note that the district court's conclusion that circumstantial evidence might prove intentional collusion between Gauger and the two experts is the kind of finding of historical fact that implicates *Johnson*, not an "abstract question of law." Evidence in the summary judgment record supporting an inference that there was an agreement included that there was an opportunity to agree (the detectives met with Johnson after interviewing Stinson, and Johnson called Rawson), and that

later experts say no competent odontologist could have possibly concluded that Stinson was the assailant.

In short, the appeals here are not like *Harris* and *Plumhoff* where the facts are clear and the only question is the legal implication of those facts. Instead, the defendants' appeals fail to take all the facts and inferences in the summary judgment record in the light most favorable to Stinson, and their arguments dispute the district court's conclusions of the sufficiency of the evidence on questions of fact. With *Johnson* still very much controlling law, we lack jurisdiction over the defendants' qualified immunity appeals in this case.

### B. Johnson and Rawson Not Entitled to Absolute Immunity

Johnson and Rawson also argued that they were entitled to absolute immunity because they were testifying witnesses. We have jurisdiction on appeal to review denials of absolute immunity at summary judgment. *Mitchell*, 472 U.S. at 525.

Witnesses in a § 1983 trial have absolute immunity from liability based on their testimony at trial. *Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983). That principle does not carry the day here, however. The Supreme Court has ruled that absolute immunity protects a prosecutor for trial preparation and trial testimony, but not for investigating the case. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *see also Rehberg v. Paulk*, 132 S. Ct. 1497, 1507 n.1 (2012) (finding witness entitled to absolute immunity for grand jury testimony and grand jury testimony preparation, but stating absolute immunity does not extend "to *all* activity that a witness conducts outside of the grand jury room"). As we discussed in the panel opinion, Stinson's claims against Johnson and Rawson focused on their

actions while Cychosz's murder was being investigated, not on their testimony at trial or preparations to testify at trial. And if a prosecutor does not have absolute immunity for investigating the case, it follows that an expert witness does not either. So Johnson and Rawson are not entitled to absolute immunity.

## III. CONCLUSION

The qualified immunity appeals are DISMISSED, and the judgment of the district court is AFFIRMED with respect to its absolute immunity rulings.

SYKES, *Circuit Judge*, dissenting, with whom BAUER, FLAUM, and MANION, *Circuit Judges*, join. My colleagues have misread the district judge's decision and failed to recognize the limits of jurisdictional principle announced in *Johnson v. Jones*, 515 U.S. 304 (1995). To the first point, the judge's decision denying summary judgment actually contains two rulings. The judge held that (1) the evidentiary record reveals genuine factual disputes about whether certain key events occurred; and (2) the defendants are not entitled to qualified immunity because the evidence in the record, when construed in Robert Stinson's favor, would permit a reasonable jury to find that they violated his right to due process by fabricating evidence used to wrongly convict him, *see Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), and suppressing evidence of the fabrication, *see Brady v. Maryland*, 373 U.S. 83 (1963), both of which are clearly established constitutional violations.

The judge's order does not neatly separate rulings (1) and (2), which I confess makes it more difficult to correctly apply the *Johnson* principle. But the absence of clean lines in the judge's reasoning does not make the entire decision unreviewable. Our task is to determine whether the decision below contains a legal ruling about qualified immunity. If it does, then we may review it. Here, there's no question that the judge's decision *does* contain a legal ruling about qualified immunity. For the reasons explained in my opinion for the panel, *Johnson* does not block jurisdiction over this appeal. *Stinson v. Gauger*, 799 F.3d 833, 838–40 (7th Cir. 2015).

*Johnson* must be read in light of *Scott v. Harris*, 550 U.S. 372 (2007), and *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014). So read, *Johnson* does not apply and we have jurisdiction to

address and decide whether the defendants are entitled to qualified immunity.

*Scott* and *Plumhoff* shed some new light on the limits of the *Johnson* jurisdictional principle, but my colleagues have misapplied *Johnson* on its own terms. To recapitulate, it is long-settled law that an order denying an immunity claim is effectively final with respect to the defendant's right to avoid the burdens of litigation and trial, so appellate jurisdiction arises under 28 U.S.C. § 1291 pursuant to the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985). *Johnson* announced a limited exception to this general rule. The Supreme Court held that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order *insofar as* that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319–20 (emphasis added).

The "insofar as" language is important. So is the context of the Court's opinion. The plaintiff in *Johnson* sued five police officers alleging that they severely beat him during his arrest, breaking his ribs and requiring hospitalization, and in so doing violated his Fourth Amendment right to be free from unreasonable seizure. *Id.* at 307. Three of the officers moved for summary judgment, claiming qualified immunity and arguing that the plaintiff had no evidence that they were actually involved in the beating. *Id.* at 307–08. The district court denied the motion, relying on the plaintiff's statement that he was beaten by unidentified officers and the officers' admissions that they were present during the arrest. The court held that this evidence raised a genuine factual dispute

about whether these particular officers participated in the beating. *Id.*

Note that this ruling dealt *only* with a disputed question of historical fact, *not* the legal question whether the evidence about the circumstances surrounding the beating—assuming the officers participated—would permit a reasonable jury to find that the officers used excessive force and thus violated the plaintiff's Fourth Amendment right to be free from unreasonable seizure. And it was precisely *because* the district court rested its ruling *solely* on a dispute about the historical facts that the Supreme Court said the order was not immediately appealable; the order contained no final legal determination about qualified immunity for the appellate court to review. *Id.* at 313–14.

Return now to the "insofar as" language, which appears in the Court's holding at the very end of the opinion. *Id.* at 319–20. Just before this closing passage, the Court explained that some qualified-immunity rulings will have both reviewable and unreviewable aspects, and acknowledged that it might sometimes be difficult "to separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')." *Id.* at 319. After all, a qualified-immunity order is unreviewable *only* "insofar as" it makes the latter kind of determination; the former kind of determination is the legal question at the heart of any qualified-immunity claim and is immediately appealable under *Mitchell* notwithstanding the Court's holding in *Johnson*. To illustrate the point, the Court "concede[d]" that if the district court "had determined that beating [the plaintiff] violated clearly established law, [the

officers] could have sought review of *that* determination." *Id.* at 318.

The lesson of this part of the Court's opinion in *Johnson* is that a "mixed" qualified-immunity order is immediately reviewable, at least in part. If the district court holds that the summary-judgment record, viewed in the plaintiff's favor, shows a violation of clearly established law—that is, would permit a reasonable jury to find for the plaintiff on his constitutional claim—then the defendant may take an immediate appeal to obtain review of *that* determination *even if* the order also identifies a genuine factual dispute.

*Scott* and *Plumhoff* bring this important point into sharper focus. As in *Johnson*, the plaintiffs in *Scott* and *Plumhoff* alleged that the police used excessive force in violation of the Fourth Amendment. Each case involved a high-speed vehicular chase. In *Scott* an officer rammed the plaintiff's fleeing car during the pursuit, and the excessive-force question ultimately turned on whether a reasonable officer could have believed that the plaintiff's flight posed an actual and imminent threat to public safety, justifying the use of this degree of force. 550 U.S. at 375, 380–84. The officer moved for summary judgment based on qualified immunity, but the district court denied the motion, holding that genuine issues of fact required submission of the case to a jury. *Id.* at 376. The Eleventh Circuit affirmed. *Id.*

The Supreme Court reversed, holding that the plaintiff's version of the facts—he claimed that he remained in control of his vehicle throughout the pursuit so his flight was not a threat to public safety—was "blatantly contradicted by the record," which included a video recording of the chase. *Id.* at 380. Applying the summary-judgment standard, the Court

addressed "the factual issue whether [the plaintiff] was driving in such fashion as to endanger human life." *Id.* at 380–81. Based on the video recording, the Court held that the plaintiff's flight "posed a substantial and immediate risk of serious physical injury to others" and that "no reasonable jury could conclude otherwise." *Id.* at 386. The Court thus had "little difficulty" concluding that "it was reasonable for [the officer] to take the action that he did." *Id.* at 384.

*Scott* did not mention *Johnson*, but as I noted in the panel opinion, the Court's decision "inescapably implies that *Johnson* should not be read too expansively." *Stinson*, 799 F.3d at 839. Indeed, "[t]he Court made this point explicit in *Plumhoff*, which specifically addressed the limits of *Johnson*'s no-jurisdiction holding in light of *Scott*." *Id.* *Plumhoff* was an excessive-force claim against police officers for shooting at a fleeing car. 134 S. Ct. at 2017–18. As in *Scott*, the district court held that the record on summary judgment revealed a material factual dispute about the level of danger posed by the driver's flight and on that basis rejected the officers' claim of qualified immunity. *Id.* at 2018. The Sixth Circuit initially dismissed the officers' appeal under *Johnson* for lack of jurisdiction, but reversed itself in light of *Scott* and affirmed the district court's denial of qualified immunity on the merits. *Id.*

The Supreme Court reversed. The Court first addressed the matter of appellate jurisdiction, noting that the order at issue in *Johnson* rested entirely on a question of historical fact about which officers participated in the beating. That is, the defendant officers "assert[ed] that they were not present at the time of the alleged beating and had nothing to do with it," but the district court held that the evidentiary record

could "support a contrary finding." *Id.* at 2019. An "evidence sufficiency" ruling of that type, the Court explained, "does not present a legal question in the sense in which the term was used in *Mitchell*, the decision that first held that a pretrial order rejecting a claim of qualified immunity is immediately appealable." *Id.*

But the order at issue in *Plumhoff*, the Court observed, "is nothing like the order in *Johnson*." *Id.* The defendant officers did not claim, for example, "that other officers were responsible for [the] shooting … ; rather, they contend[ed] that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law." *Id.* More specifically, the officers acknowledged that they fired shots at the fleeing car but argued that their conduct was a reasonable response to the degree of danger created by the driver's flight, or alternatively, that a reasonable officer would not have known that the shooting was unjustified in light of that danger. *Id.* These were "legal issues … quite different from any purely factual issues that the trial court might confront if the case were tried," and "deciding legal issues of this sort is a core responsibility of appellate courts." *Id.* So *Johnson* did not apply. *Id.*

Moving to the merits, the Court held that the case was materially indistinguishable from *Scott*. The summary-judgment record established "beyond serious dispute that [the driver's] flight posed a grave public safety risk, and here, as in *Scott*, the police acted reasonably in using deadly force to end that risk." *Id.* at 2022.

As *Scott* and *Plumhoff* make clear, it's a mistake to read *Johnson* as a categorical bar to appellate review of a qualified-immunity order whenever the district court makes

an "evidence sufficiency" ruling or concludes that facts are in dispute. If that were the right way to understand *Johnson*, then the district-court orders in *Scott* and *Plumhoff* were unreviewable and the Court would not have reached the merits of the qualified-immunity question. As the Court explained in some detail in *Plumhoff*, *Johnson* blocks an immediate appeal *only* when the district court's order is limited to pure questions of historical fact—in other words, when the sole dispute is whether and how certain events or actions occurred. *Johnson* does *not* block immediate appeal when the issue is whether the evidence, if credited by a jury, shows a violation of a clearly established constitutional right. That is, after all, the core qualified-immunity question.

Another way to think about the *Johnson* principle is this: The jurisdictional bar applies if the issues raised on appeal are limited to the "who, what, where, when, and how" of the case. The *Johnson* bar does not apply if the appeal asks whether the evidence in the summary-judgment record— construed in the plaintiff's favor—would permit a reasonable jury to find that the defendant committed the claimed constitutional violation and the constitutional right in question was clearly established at the time the defendant acted.

Properly understood, then, *Johnson*'s exception to the *Mitchell* rule is really quite narrow. That makes sense in this context. Qualified immunity protects public officers from the burdens of litigation and trial; it is immunity from *suit*, not just protection against liability. *Mitchell*, 472 U.S. at 525–27. The parties in § 1983 litigation often disagree about key historical facts, and it's not uncommon for district judges to deny qualified immunity on both factual *and* legal grounds. Immunity from suit wouldn't mean much if these mixed

orders were categorically unreviewable. Indeed, the Court acknowledged in *Johnson* that many qualified-immunity appeals are of this mixed variety. *Johnson*, 515 U.S. at 318–19.

This is one of those mixed cases. The parties dispute two historical facts that the district judge concluded are material to the defendants' potential liability: (1) whether Dr. Johnson met with the two detectives and showed them his initial sketch of the killer's dentition *before* the detectives canvassed the neighborhood and interviewed Stinson; and (2) whether Dr. Johnson or Assistant District Attorney Daniel Blinka contacted Dr. Rawson for a second opinion. If the judge's order denying summary judgment were limited to the identification of these key factual disputes, we would have no legal issue to review, *Johnson* would apply, and we'd have to dismiss the appeal for lack of appellate jurisdiction.

But the judge's order is *not* limited to identifying these material factual disputes. The judge also ruled that if Stinson's version of these events is credited—namely, if the preinterview meeting occurred and Dr. Johnson rather than ADA Blinka called Dr. Rawson—then a reasonable jury could find, based on these facts and the rest of the evidentiary record (construed in Stinson's favor), that the defendants conspired to violate Stinson's right to due process by delivering up fabricated odontology opinions and covering up the falsehoods, two clearly established constitutional violations.

This latter aspect of the judge's summary-judgment order is a final no-immunity ruling; it fully resolved the qualified-immunity question against the defendants. That's a legal issue and is subject to immediate review under *Mitchell* notwithstanding the presence of material factual disputes. If

this aspect of the judge's decision is unreviewable until after trial, then the immunity is completely lost; any mistake in the judge's legal conclusion goes wholly uncorrected.

Regrettably, by misreading *Johnson*, *Scott*, and *Plumhoff*, my colleagues have stripped the defendants of their right to meaningful review of the judge's adverse qualified-immunity ruling. That ruling is not unreviewable. Appellate jurisdiction is secure, and we should reverse.

Giving the evidence a Stinson-friendly benefit of the doubt, we must accept the following as true for purposes of deciding whether the defendants are protected by qualified immunity:[1] (1) Dr. Johnson met with the detectives before their field canvas and showed them his preliminary sketch of

---

[1] At several points in the majority opinion, my colleagues say that the district judge "concluded" that certain historical events occurred and "determined" that certain facts exist. *See, e.g.*, Majority Op. at p. 16 ("The district court concluded that viewing the submitted evidence in the light most favorable to Stinson, such a meeting did take place, and that during the pre-interview meeting Johnson showed the detectives a sketch of the assailant's dentition reflecting a missing tooth to the right of the central incisor."); *id.* at p. 17 ("The district court concluded that, viewing the evidence in the light most favorable to Stinson, Johnson made the first contact with Rawson."); *id.* at p. 21 ("The district court determined that taking the facts in Stinson's favor, 'Gauger was cognizant of Johnson's shifting view of which tooth was missing' and 'was fully aware' of the 'contents of his conversations with Johnson and what he implied in their second meeting, following his and Jackelen's interview of Stinson,' namely that Gauger implied a desired result in the expert opinions."). This phrasing is wrong as a matter of basic summary-judgment methodology and potentially misleading. District judges are not empowered to make "conclusions" or "determinations" of fact at summary judgment. To be fair, the error originates in the decision below. We should not repeat it.

the killer's dentition, which depicted a missing upper right lateral incisor (the tooth just to the right of the two front teeth); (2) Dr. Johnson changed his mind about which tooth the killer was missing after the detectives interviewed Stinson and saw that he was missing his right central incisor (that is, his right front tooth); (3) Dr. Johnson's expert opinion that Stinson's dentition matched the bite marks on the victim's body fell far below the professional standards of forensic odontology at the time (this was not a close call, according to Stinson's expert); (4) Dr. Johnson, not ADA Blinka, called Dr. Rawson to arrange a second opinion; and (5) Dr. Rawson's opinion was likewise seriously substandard.[2]

Accepting these facts as true establishes only that Drs. Johnson and Rawson were grossly negligent in declaring that Stinson's dentition matched the bite marks on the victim's body. In other words, their opinions were objectively unreasonable, and egregiously so. But an error in forensic analysis—even a grossly unprofessional error—is not a due-process violation. Fabricating evidence to convict an innocent person is a clear due-process violation, but a due-process claim based on an allegation that an expert fabricated his opinion requires evidence from which a reasonable jury could infer that the opinion was both wrong *and* that the expert *knew it was wrong* at the time he gave it. In other

---

[2] Stinson's expert may be qualified to offer an opinion about the deep flaws in the odontologists' work, but he is not qualified to "opine[] that Johnson and Rawson *knowingly manipulated* the bite mark evidence and Stinson's dentition to make them appear to match." Majority Op. at p. 19 (emphasis added). Nothing in the record supports the expert's ability to know or opine about their state of mind.

words, it requires evidence that the expert was not just badly mistaken but that he *lied*. So Stinson needed at least *some* circumstantial evidence to support an inference that Drs. Johnson and Rawson knew that he was not the killer and implicated him anyway.

He has none. The evidence shows only that Drs. Johnson and Rawson were grossly negligent in their opinions and had an opportunity to reach an agreement with Gauger to frame Stinson. A deeply flawed forensic opinion plus evidence of an opportunity to plot a conspiracy is not enough. Stinson has no evidence of what was said in the preinterview meeting between Dr. Johnson and the detectives. He has no evidence of what was said in the phone call between Drs. Johnson and Rawson (assuming it occurred). He has no evidence of *any* motive on the part of Drs. Johnson or Rawson to falsely implicate Stinson. Why would credentialed forensic experts want to frame him? A jury could only guess. It's sheer speculation that a conspiracy to frame Stinson was hatched in these conversations and that the experts implemented it by lying to the prosecutor, the John Doe judge, and the judge and jury at trial. No *evidence* exists to support this theory.

Think of it this way: Would the evidence in this record establish probable cause for a warrant to arrest these defendants for committing perjury in the John Doe proceeding or at trial? Clearly not. A badly botched expert opinion plus a mere opportunity to plot a frame-up does not support probable cause for a perjury charge. Something more would be needed.

On this record, even when construed in Stinson's favor, no reasonable jury could find that Drs. Johnson and Rawson

violated Stinson's right to due process by fabricating their expert opinions and suppressing evidence of the fabrication. The odontologists are entitled to qualified immunity.

The related claim against Gauger is entirely derivative. Stinson claims that the detective solicited the fabrication and participated in a cover-up. Because no reasonable jury could find that the odontologists fabricated their opinions, Gauger too is entitled to qualified immunity.

I respectfully dissent.