In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 08-1627

VIRGINIA VIILO,

*Plaintiff-Appellee,*

*v.*

KEVIN EYRE and MONTELL D. CARTER,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:05-cv-00216-CNC—**Charles N. Clevert, Jr.**, *Judge.*

_____

ARGUED SEPTEMBER 23, 2008—DECIDED OCTOBER 27, 2008

_____

Before BAUER, CUDAHY and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Virginia Viilo sued the City of Milwaukee and two of its police officers under the Fourth Amendment via 42 U.S.C. § 1983 after Officer Montell Carter shot and killed her dog Bubba. The district court denied the defendants' motion for summary judgment on the basis of qualified immunity and the defendants took an interlocutory appeal challenging this denial. The defendants' interjection of factual dis-

putes deprives us of jurisdiction. Accordingly, we dismiss the appeal.

## I.

On the evening of August 15, 2004, Virginia Viilo was relaxing in her backyard with her elderly mother, her boyfriend, his parents and her dog Bubba, a seven-year-old Labrador Retriever/Springer Spaniel mix. Their rest was disturbed when a team of six officers from the Milwaukee Police Department, including Officer Montell Carter, arrived at Viilo's house. The officers had received an anonymous tip that a wanted felon had entered Viilo's home accompanied by a pit bull. Carter prepared for this eventuality by arming himself with a shotgun because, as he later said, "the best weapon for a dog is a shotgun through my experience."

Bubba was the first to hear the officers as they fanned out and approached Viilo's front door. He ran from Viilo's backyard to a gangway along the side of the house leading to the front yard, leapt a three-foot high gate and ran toward the officers, who were by now close to Viilo's front porch. Although the officers testified that Bubba was growling and exposing his teeth and gums, a neighbor who witnessed the scene later testified that the dog was coming out to greet them. Apparently fearing for the officers' safety, Carter fired two shots at Bubba, hitting him at least once and causing comminuted and compound bone fractures to his front leg. Bubba, in turn, retreated to the bushes near the front window of Viilo's house where he hid for the next ten minutes.

Carter kept watch over Bubba, while the other officers proceeded to the backyard to make contact with Viilo and her guests. The officers refused to allow Viilo to retrieve Bubba or to call a veterinarian. Some ten minutes later, Sergeant Kevin Eyre arrived on the scene. During this time, a crowd of Viilo's neighbors responded to the commotion by gathering around the house; some of them were shouting at the officers, telling them that Bubba wasn't a bad dog. Apparently undeterred, Eyre approached the bush where Bubba was hiding, which prompted Bubba to emerge from the bush and head toward the gangway leading to the backyard. Although the officers stated that Bubba ran out from under the bushes with his teeth and gums exposed, multiple witnesses testified that Bubba was limping and whimpering as he emerged from the bushes and that he was just trying to get back to Viilo.

Viilo's boyfriend later testified as to what happened next:

> I walked to the gate, I opened the gate, and the gate makes a metal sound. And I was calling the dog, and as I opened up the gate to go out the front, I could see the dog move from in front of the house—from what I seen, moving from the front of the house to the side. He just kind of like slowly moved over. And when he saw me, he sat down, and he looked me right in the eye, and he just—in the eyes, and he was just looking at me. And all of a sudden, an officer came out from—it looked like from the front . . . And he lowered his shotgun, and I just screamed. I went "No." I says—you know, I just—I remember just hollering "No, no."

Eyre raised his handgun to shoot Bubba. Although he later professed to fear for his own safety, he nevertheless reconsidered his decision to use his handgun and ordered Carter, who had a shotgun, to shoot Bubba instead. The crowd, meanwhile, had grown larger and people were yelling at the officers not to shoot. Ignoring the crowd's pleas, Carter shot Bubba a third and then a fourth time. Although Eyre later testified that he ordered the fourth shot to end Bubba's suffering, he made no mention of this to the police lieutenant who wrote the official police report.

## II.

Although this is not, to say the least, a record that paints a sympathetic picture of the defendants' actions on the night Bubba was killed, the defendants nonetheless argue that they are entitled to qualified immunity as a matter of law.

Qualified immunity protects government officials from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Unless and until the Supreme Court overturns *Saucier v. Katz*, 533 U.S. 194 (2001),[1] the defendants' assertion of qualified immunity

---

[1] In *Pearson v. Callahan*, No. 07-751, the Supreme Court directed the parties to brief and argue "[w]hether the Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001), should be overruled."

(continued...)

is subject to the familiar, two-step analysis: first, we ask "whether a constitutional right would have been violated" on Viilo's version of the facts; if so, we then ask "whether the right was clearly established." *Id.* at 200.

There is no question that Viilo's account of events establishes a violation of her constitutional rights. Every circuit that has considered the issue has held that the killing of a companion dog constitutes a "seizure" within the meaning of the Fourth Amendment. *See Altman v. City of High Point, N.C.*, 330 F.3d 194, 204-05 (4th Cir. 2003); *Brown v. Muhlenbergs Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001); *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by Robison v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002); *see also Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir. 2001) (holding that the seizure of a horse is a Fourth Amendment event). The defendants' actions, therefore, were constitutional only if reasonable. *See United States v. Place*, 462 U.S. 696, 703 (1983).

Both common sense, and indeed Wisconsin law, *see* Wis. Stat. § 174.01(1), counsel that the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable. *See, e.g., Brown*, 269 F.3d at 210-11. The defendants make two attempts to resist this conclusion: first, they argue that the killing was justified based on the risk that

---

[1] (...continued)

*See* http://www.scotuswiki.com/index.php?title=Pearson_v._ Callahan (visited Oct. 1, 2008).

Bubba might interfere with their investigation; second, they argue that it was not clearly established in 2004 that the seizure of a dog was a Fourth Amendment event.

This first argument is obviously and vigorously contested. Despite the police testimony, at least seven witnesses testified that Bubba wasn't interfering with the officers when he was shot for the third and forth time. Rather, according to the witnesses, he was attempting to limp back to his owner. It should go without saying that this testimony, if it is credited by the jury, does not support the conclusion that the decision to shoot Bubba a third and fourth time was reasonable.

As to the defendants' second argument, it is true that to be "clearly established," a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim. *Brousseau v. Haugen*, 543 U.S. 194, 198-99 (2004). Nevertheless, the defendants had reasonable notice that killing Bubba would constitute the "seizure" of an "effect" within the meaning of the Fourth Amendment. In 2001, the Third Circuit said that "the state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger. . . . *This does not mean, however, that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on.*" *Brown*, 269 F.3d 205, 210-11 (emphasis added). Along the same lines, in a case decided after the events at issue here, the Ninth Circuit held that it was clearly established *in 1998* that an officer cannot kill a person's pet unnecessarily. *See*

*San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977-78 (9th Cir. 2005).

While *Brown* and *Hells Angels* clearly establish that it is unreasonable for officers to kill a person's pet unnecessarily, these decisions are not essential to reaching this conclusion. "[T]he very action in question [need not have] previously been held unlawful" for a public official to have reasonable notice of the illegality of some action. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In 2001, we held that domestic animals are "effects" within the meaning of the Fourth Amendment. *See Siebert*, 256 F.3d at 656. The *Siebert* decision is enough to give police officers reasonable notice that unnecessarily killing a person's pet offends the Fourth Amendment.

### III.

In fact, were we able to reach the merits of this appeal, there would be a strong case for affirming the district court. However, the existence of disputed issues of fact deprives us of jurisdiction to address the defendants' qualified immunity defense.

Because 28 U.S.C. § 1291 gives appellate courts jurisdiction to hear appeals only from "final decisions," interlocutory appeals are the exception, not the norm. In *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Supreme Court clarified the scope of this exception, holding that orders denying summary judgment are immediately appealable under the collateral order doctrine where (1) the defendant was a public official asserting a

defense of qualified immunity, and (2) the issue appealed concerned not which facts the parties might be able to prove, but rather whether or not those facts showed a violation of clearly established law. *Id.* at 528.

The basis for the *Mitchell* decision was the Court's conclusion that pretrial orders denying qualified immunity were "effectively unreviewable," since review after trial would come too late to vindicate the right of public officials not to stand trial in certain circumstances. *Id.* at 525-27. At the same time, the Court made it clear that the right of public officials not to stand trial is far from absolute, and that orders denying summary judgment on the basis of qualified immunity would be immediately appealable only when

> [an] appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.

*Id.* at 528. The Supreme Court unanimously reaffirmed this limit to the immediate appealability of orders denying summary judgment on the basis of qualified immunity in *Johnson v. Jones*, 515 U.S. 304 (1995), holding that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether

or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319-20.

Of course, a district court's mere assertion that disputed factual issues exist does not automatically preclude an immediate appeal. *See Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996). To the contrary, rulings remain appealable where the defendant appeals the denial of qualified immunity on the basis of stipulated facts, on the facts as alleged by the plaintiffs or on the facts the district court deems sufficiently supported to create jury issues. *See Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (Newman, J.). However, as Judge Newman went on to emphasize, "[w]hat we may not do, after *Johnson* and *Behrens*, is entertain an interlocutory appeal in which a defendant contends that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense." *Id.* at 91. Guided by these principles, we have not hesitated to dismiss interlocutory appeals where the defendant interposes factual issues in the appeal. *See, e.g., Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998); *Gorman v. Robinson*, 977 F.2d 350, 355 (7th Cir. 1992).

The present case easily fails the standard for appealability in the aftermath of *Johnson* and *Behrens*. The district court held that "[a] reasonable jury could find that at Eyre's order Carter shot Bubba as he was crying, sitting down, moving slowly, or headed to the backyard." *Viilo v. City of Milwaukee*, 552 F. Supp. 2d 826, 840 (E.D. Wis. 2008). The defendants have manifestly not based their

appeal on these facts. Indeed, even on appeal, the parties' views of the facts could not be more different. Viilo introduced evidence from two experts who concluded that as a result of Bubba's injuries after the first two shots, he would not have posed a threat. This conclusion was corroborated by the testimony of Viilo's boyfriend and at least six neighbors, each of whom stated that Bubba was limping, crying and trying to get back to the gangway leading to the backyard when he was shot for the third and fourth times.

The defendants reject this testimony. According to them, Bubba "came out of the bushes, with its gums and teeth exposed, growling and barking." They insist that "[t]he third shot . . . was intended to protect Sergeant Eyre, Officer Carter and the other officers" because "[t]here is no evidence that Bubba became less dangerous after the first two shots." Further, they gloss over factual issues regarding Eyre's motivation for ordering the fourth shot. In denying rather than embracing the facts the district court held to be sufficiently well-supported to create jury issues, the defendants have pleaded themselves out of court. The appeal is therefore

DISMISSED.