In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-2603

ESTATE OF DEREK WILLIAMS JR.,
deceased, by Sharday Rose, Special
Administrator, et al.,

*Plaintiffs-Appellees*,

*v.*

JEFFREY CLINE, et al.,

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin
No. 2:16-cv-00869-JPS — **J.P. Stadtmueller**, *Judge*.

———————————

ARGUED MAY 22, 2018 — DECIDED AUGUST 31, 2018

———————————

Before FLAUM, and RIPPLE, *Circuit Judges*, and GETTLEMAN,
*District Judge*.*

———————————

* Of the Northern District of Illinois, sitting by designation.

GETTLEMAN, *District Judge*. The facts of this case are disturbing, and many are hotly contested. It is undisputed, however, that Derek Williams died on July 6, 2011, while in the custody of the City of Milwaukee Police Department ("MPD"). Williams left three surviving children who, along with his estate, sued the City of Milwaukee and several MPD officers (collectively, defendants) under 42 U.S.C. § 1983. Defendants filed a motion for summary judgment invoking qualified immunity. The district court denied that motion, finding that contested facts existed with respect to the liability of all eleven defendant officers. *See Williams v. City of Milwaukee*, 274 F. Supp. 3d 860 (E.D. Wis. 2017) (hereafter, "*Williams*"). Defendants appealed. We remand the case to the district court to perform an individual analysis of each defendant officer's claim of qualified immunity.

## I.

In deciding defendants' motion for summary judgment after the completion of discovery by the parties, the district court thoroughly discussed the facts for nearly nine pages, noting where they were disputed, and construing them in favor of Williams, the non-movant. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). We need provide only a brief summation.

Shortly after midnight on July 6, 2011, Williams, a 22-year-old African American man in good physical shape, was walking north on Holton Street. Williams was wearing a neoprene mask, and was holding a cell phone under his clothing, which made him appear armed. Four of the defendant officers were driving in two separate police cars nearby and observed Williams approaching two people from behind. Believing they were witnessing an attempted armed robbery, two of the

officers stopped their car. When they did, Williams ran across Holton Street and through an alley. One officer ran after Williams while his partner drove in the direction Williams ran. The other two officers followed in their car. Several other officers responded to the scene to set up a perimeter and search for Williams.

Approximately eight minutes after Williams fled, two of the defendant officers found Williams hiding in a nearby backyard. When the other officers heard that Williams had been located, they began moving toward the area. To get to the backyard Williams had run 200 to 300 yards and jumped over a fence. Williams and the officer who chased him were both breathing heavily. There was a brief struggle, and the two arresting officers pulled Williams down so that he was lying on his back, then flipped him over to apply handcuffs. One of the officers remained on top of Williams after he was handcuffed, and Williams stated that he could not breathe. The officer then shifted so that the majority of his weight was no longer on Williams' back, and radioed to dispatch that Williams was in custody. That transmission was recorded, and Williams can be heard complaining that he could not breathe. Williams repeated that he could not breathe, then went limp when the officers lifted him up. The officers then placed Williams on the ground to evaluate him, and to avoid hurting their backs. Several of the officers dispersed to search for the suspected gun.

Once Williams was back on the ground he was breathing heavily and sweating, his eyes were closed, and he was unresponsive. The officers believed that Williams was faking distress to make it more difficult to move him out of the backyard. One of the officers performed a "sternum rub," a painful

procedure used to determine whether someone is truly unconscious. Williams then opened his eyes and told the officers that he was "just playing around" with the alleged robbery victims, and that they were his friends. Williams continued to complain that he could not breathe, loudly enough that nearby neighbors heard him. They also heard one of the officers telling Williams to shut up. One of these neighbors made a phone call and related that the police were killing someone who was saying that he could not breathe.

About five minutes later, the officers moved Williams to the front yard. Williams again went limp and had to be dragged. The officers, still convinced that Williams was intentionally obstructing their efforts to move him, told Williams to stop "playing games." Williams continued to state that he could not breathe. While moving Williams to the front yard the group was blocked by a yard sign, and one of the officers let go of Williams. Williams fell face first onto the ground. Two of the officers picked Williams back up and dragged him to the front yard. One neighbor who witnessed this said that Williams "looked like he was already dead" and continued to say he could not breathe while the officers cursed at him. Another neighbor claims that Williams was taken to the police car without difficulty. Yet another neighbor called 911 to report that Williams was yelling that he could not breathe, and was informed that paramedics could not be sent unless the officers called for medical assistance.

The officers then took Williams to a police car and either threw or directed him into the back seat. They did not discuss Williams' condition with the officer who was assigned to the car. Sitting in the driver's seat, that officer activated the recording system in the car, but did not activate a video feed so

that he could observe Williams on his computer screen, nor did he turn to look at Williams. Instead, the officer repeatedly asked Williams his name, and when Williams answered with "I can't breathe," "I'm dying," and a request for an ambulance, which the officer denies hearing, the officer told Williams that he was "breathing just fine" and "playing games." He also rolled the window down and turned on the air conditioner. Williams' girlfriend was nearby, and saw Williams rocking around and heard him saying that he could not breathe. The video of Williams in the back seat shows him in obvious distress, eventually collapsing onto the door of the car.

Another officer came to relieve the officer who was sitting with Williams, but the two did not discuss Williams' complaints. That officer also failed to observe Williams through the video feed, and turned to look at Williams only when he was already slumped over and had stopped moving. At that point the officer got out of the car to check Williams for a pulse and breath. Finding neither, the officer still did not conclude that Williams' medical condition was serious, and did not call for medical assistance. Instead he went to another police car in search of help and found none. He returned to the car alone and, at that point, radioed for help from other officers. A responding officer requested medical help for the first time, approximately twelve minutes after Williams was put in the car, and three minutes after he was found motionless. Another officer searched for a plastic bag or mouth guard, and then began administering CPR. Paramedics took over to no avail. Williams was pronounced dead at 1:41 a.m.

The cause of death is also disputed. The Milwaukee County Medical Examiner found that the cause of death was

sickle cell crisis brought about by Williams' flight from and altercation with the police. A deputy medical examiner with the U.S. Armed Forces Medical Examiner System reviewed the autopsy reports and concluded that the cause and manner of death were undetermined.

The district court concluded that material facts concerning the defendant officers' conduct were contested, thus defeating summary judgment based on qualified immunity. On appeal, defendants continue to contest many of the facts, but also argue that even taken in the light most favorable to plaintiffs, the facts entitle them to summary judgment. Plaintiffs argue that this court lacks jurisdiction to review the district court's denial of summary judgment because it is interlocutory.

## II.

Generally speaking, "the denial of summary judgment is not appealable because it is not a 'final decision' for purposes of 28 U.S.C. § 1291." *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013) (citing *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011)). The analysis changes, however, when a district court denies summary judgment based on qualified immunity. Such an order "often is immediately appealable on the basis that it is a final decision on the defendant's right not to stand trial and, as such, a collateral order." *Id*. (citing *Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985)). Appellate review is limited, however:

> When the district court denies qualified immunity at summary judgment because the plaintiff's evidence, if believed by a trier of fact, would suffice to show a constitutional violation, and the court concludes that the governing rule is

> well established, any appeal must be limited to the legal underpinnings of the court's ruling.

*Jones v. Clark*, 630 F.3d 677, 680 (7th. Cir. 2011).

Under *Johnson v. Jones*, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." 515 U.S. 304, 319–20 (1995). However, "*Johnson* does *not* prohibit [appellate review of] the abstract legal question of whether a given set of undisputed facts demonstrates a violation of clearly established law." *Gutierrez*, 722 F.3d at 1009 (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Leaf v. Shelnutt*, 400 F.3d 1070, 1078 (7th Cir. 2005)). In other words, we have appellate jurisdiction only if "the issue appealed concern[s], not which facts the parties might be able to prove, but, rather, whether or not certain given facts show[] a violation of 'clearly established' law." *Stinson v. Gauger*, 868 F.3d 516, 524 (7th Cir. 2017) (en banc) (alterations in original) (quoting *Johnson*, 515 U.S. at 311).

Substantive qualified immunity analysis encompasses two distinct questions: (1) whether defendants violated a constitutional right; and (2) whether that "right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Our case law in this area indicates we must conduct a predicate jurisdictional analysis as to *each prong* of the qualified immunity standard. *See, e.g.*, *Estate of Clark v. Walker*, 865 F.3d 544, 551–53 (7th Cir. 2017) (exercising jurisdiction over the second prong but not the first prong); *see also Broadfield v. McGrath*, No. 17-3071, 2018 WL 2722504, at *2–3 (7th Cir. June 6, 2018) (unpublished order) (same).

A defendant invoking immunity under prong one can raise two types of arguments. First, he may argue there is insufficient evidence to support the plaintiff's version of the facts, *see, e.g.*, *Johnson*, 515 U.S. at 313, or that under defendant's version of the facts, no constitutional violation occurred. *See, e.g.*, *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). At bottom, these are *factual* arguments over which we lack interlocutory jurisdiction. *See, e.g.*, *Johnson*, 515 U.S. at 313; *Stinson*, 868 F.3d at 522–29; *Gutierrez*, 722 F.3d at 1008–14; *Viilo*, 547 F.3d at 710–12. Second, the defendant may also argue that, accepting the facts and inferences in the light most favorable to the plaintiff, no constitutional violation occurred. This is a purely *legal* question that we have jurisdiction to review. *See, e.g.*, *Clark*, 630 F.3d at 680.

Our jurisdictional analysis under the second prong is often more straightforward. After all, "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions" is typically "a question of law," and thus, within our jurisdictional purview. *Mitchell*, 472 U.S. at 528; *see also Behrens*, 516 U.S. at 313 (describing the "clearly established" prong as an "abstract issu[e] of law" (alteration in original) (quoting *Johnson*, 515 U.S. at 317)). Nevertheless, we would lack jurisdiction under the second prong if, for example, a defendant argued that under *his* version of the facts, the law was not clearly established. Such a litigation strategy would no longer be "conceptually distinct from the merits of the plaintiff's claim." *See Mitchell*, 472 U.S. at 527.

The inquiry does not end there. In addition to examining the qualified immunity prongs separately, we must also consider how defendants frame their qualified immunity arguments on appeal. It is well settled that "an appellant

challenging a district court's denial of qualified immunity effectively pleads himself out of court by interposing disputed factual issues in his argument." *Gutierrez*, 722 F.3d at 1010. Of course, any reference to a disputed fact, however cursory, is not automatically disqualifying. *Id.* At 1011. To the contrary, "the mere mention of disputed facts in an otherwise purely legal argument is not fatal, and we have held accordingly that jurisdiction exists where the appellant mentions factual disputes but the legal argument is not dependent on those factual disputes—i.e., where the legal and factual arguments are separable." *Id.* Rather, "[t]he key inquiry is whether the appellant's arguments necessarily depend upon disputed facts. If an argument is not dependent upon disputed facts, the court simply can disregard mention of the disputed facts and address the abstract issue of law." *Id.* (quoting *White v. Gerardot*, 509 F.3d 829, 836 (7th Cir. 2007)).

A number of cases from our circuit effectively illustrate this principle. In *Viilo*, for example, the defendants disputed whether the plaintiff's dog was interfering with their investigation. 547 F.3d at 710. According to the court, however, it went "without saying" that such a fact was dispositive of the qualified immunity inquiry. *See id.* Similarly, in *Gutierrez*, the defendant's qualified immunity argument was "entirely dependent on [a] disputed fact"—whether the plaintiff had an unsteady gait that supported a probable cause seizure. 722 F.3d at 1011. Finally, the defendants in *Stinson* refused to credit the plaintiff's claim that a particular meeting between two defendants took place, which the court held was "critical to [the plaintiff's] theory that the defendants fabricated evidence and failed to disclose *Brady* material." 868 F.3d at 526.

Thus, if the defendant interposes disputed factual issues in his interlocutory argument, and if those disputed factual issues are material to the qualified immunity analysis, then the defendant has effectively pleaded himself out of court and we do not have jurisdiction. Applying this framework to the facts and pleadings in the instant case, we conclude that this court lacks jurisdiction to decide whether a constitutional violation occurred, that is, prong one of the qualified immunity inquiry. To determine whether an officer's response to an arrestee's medical needs was objectively unreasonable, we generally consider four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). As in *Ortiz*, the "third and fourth factors are off the table in this case" because the defendant officers do not claim that calling an ambulance "would have been burdensome or compromised any police interests." *Id* at 530–31. Given that concession, our analysis hinges on the first two factors.

Critically, though, those two legal factors necessarily depend upon disputed facts and inferences that defendants failed to accept in the light most favorable to plaintiff throughout their briefing and at oral argument. For example, in their brief, defendants repeatedly asserted that certain officers did not hear Williams state that he could not breathe. Indeed, defendants go so far as the state that: (1) the evidence cited by the district court could "hardly establish that … there was a factual dispute as to precisely when, or if, [certain defendants] … heard Mr. Williams state that he could not breathe"; (2) "there is no evidence which contradicts the

assertions made by [certain defendants] that they did not, at any time, hear Mr. Williams say that he could not breathe"; and (3) "Officers Cline, Thoms, Thimm, and Letteer and Sergeant Thiel and Kaul did not hear Mr. Williams state that he had any difficulty breathing while they were in the backyard at 2752 North Buffum." However, the district court concluded—based upon the recorded dispatch call, officers' deposition testimony, testimony from civilian witnesses, and the squad car video—that "the jury could reasonably infer that each Officer Defendant actually heard, or studiously avoided hearing, Williams' complaints of respiratory distress." This disputed factual issue is material to our prong one inquiry because it goes to whether defendants had notice of Williams' medical condition. Likewise, defendants further claim that, even if certain officers *did* hear Williams' statements, "there is no evidence which … suggests that any Appellant actually thought that Mr. Williams was experiencing a medical emergency." But that assertion belies the district court's factual finding that "if Plaintiff's evidence is believed, the Officer Defendants … were well aware that his condition was real and required immediate attention." This factual dispute is equally material because it goes to the seriousness of Williams' medical need.

Collectively, then, defendants' prong one arguments are intertwined with disputed facts—namely, whether the defendants were on notice that Williams had a serious medical condition. Defendants do not concede these critical disputed factual issues for purposes of prong one of qualified immunity. Nor was their cursory statement at oral argument sufficient to overcome the jurisdictional hurdle in this procedural posture. On the whole, defendants rely upon material factual disputes that are inseparable from the legal question of

whether a constitutional violation occurred. Because their arguments require us to revisit these disputed factual questions, we lack jurisdiction to decide the first step of the qualified immunity analysis. *See Walker*, 865 F.3d at 551 (holding that we lacked jurisdiction to determine whether defendant actually knew about plaintiff's medical condition and whether plaintiff's medical condition was sufficiently serious because such disputes were "factual in nature").

Nevertheless, we conclude that this court has jurisdiction to answer the second question—whether the alleged constitutional right at issue was clearly established at the time of the incident. Defendants argue that, "even assuming arguendo that appellants' actions amounted to a constitutional violation, if the law did not put them on notice that their conduct would clearly be unlawful, then they are entitled to qualified immunity." This is a "legal issue[] … quite different from any purely factual issues that the trial court might confront if the case were tried." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014). To answer this question, we "simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Johnson*, 515 U.S. at 319. Indeed, "deciding legal issues of this sort is a core responsibility of appellate courts." *Plumhoff*, 134 S. Ct. at 2019. Defendants' alternative argument focuses not on which facts plaintiff can prove, but instead on whether the undisputed facts "show a violation of clearly established law"—a purely legal question within the scope of our interlocutory appellate jurisdiction. *Stinson*, 868 F.3d at 524 (internal quotation marks and citation omitted).

Consequently, we conclude that this court has appellate jurisdiction to decide whether the constitutional right alleged

by plaintiffs was clearly established at the time of Willliams' death. As discussed below, however, because the district court failed to make an individualized assessment of each defendant officer's claim of qualified immunity, we must remand the case for that purpose.

**III.**

"Qualified immunity is an individual defense available to each individual defendant in his individual capacity." *Bakalis v. Golembeski*, 35 F.3d 318, 326–27 (7th Cir. 1994). Our cases demonstrate a painstaking commitment to an individualized qualified-immunity analysis, especially when the facts relative to the alleged constitutional violation differ from defendant to defendant. *See, e.g.*, *Petties v. Carter*, 836 F.3d 722, 731–33 (7th Cir. 2016) (en banc) (considering separately actions of individual physicians to determine whether each was deliberately indifferent to plaintiff's medical needs); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (considering the reasonableness of each defendant-officer's actions in restraining arrestee).

Under our case law, the district court had the duty to determine whether *each* defendant violated Williams' Fourth Amendment rights and, if so, whether that right, defined at an appropriate level of specificity, was clearly established at the time that Williams was in custody. *See, e.g.*, *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Following this approach, the district court's first step should have been to evaluate each defendant's conduct in light of the four factors set forth in *Ortiz*, 656 F.3d at 530. *See supra* at 11. If the court concluded that, on balance, these factors, viewed in the light most favorable to the plaintiff, established a Fourth Amendment violation, *see Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th

Cir. 2011), then its next step should have been to evaluate whether the contours of the Fourth Amendment right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Volkman*, 736 F.3d at 1090 (internal quotation marks omitted).

Here, each defendant-officer had a different degree of contact with Williams and had different assigned responsibilities with respect to the apprehension of Williams and investigation of the alleged armed robbery. Although the district court's recitation of facts acknowledges the officers' varying encounters with Williams, its qualified-immunity analysis lacks any individualized assessment. *See Williams*, 274 F. Supp. 3d at 884. For example, the only officers mentioned by name in the district court's discussion of the plaintiffs' failure-to-provide-medical-care claim were Officers Cline and Ticcioni. With respect to these officers, the court stated: "Rather than supporting their assessment that Williams was malingering, the evidence that Cline and Ticcioni took limited actions to assuage Williams' distress (rolling down the car window and leaning off of Williams' back) supports the inference that they *knew* his condition was serious." *See id.* at 885. However, only Officer Cline was in the car for an extended period of time with Williams, and only Officer Ticcioni had Williams in a prone position while handcuffing him. The district court's conclusions based on these facts, therefore, are not necessarily imputed to the other officers.

Consequently, before we can review whether or not the facts taken in the light most favorable to plaintiffs entitle any of the defendant officers to qualified immunity, the district court must articulate an individualized analysis of such facts as applied to each defendant officer.

## IV.

For the reasons discussed above, the order of the district court is VACATED and the case is REMANDED for proceedings consistent with this opinion.

RIPPLE, *Circuit Judge*, dissenting. The majority concludes that, given the factual findings of the district court, we lack jurisdiction to consider the first prong of the qualified-immunity analysis: whether the individual officers violated Mr. Williams's constitutional rights. It concludes, however, that we have jurisdiction to consider the second prong of the qualified-immunity analysis: whether those constitutional rights were clearly established.

This approach, in my view, suffers from two infirmities. First, it fails to recognize that the district court's lack of a defendant-by-defendant analysis infected both prongs of its qualified-immunity analysis. Second, it interposes the two-pronged, substantive analysis of qualified-immunity claims into its consideration of jurisdiction.

One of the fixed stars in this area of our work is that qualified immunity "is an *individual* defense available to each individual defendant in his individual capacity." *Bakalis v. Golembeski*, 35 F.3d 318, 326–27 (7th Cir. 1994) (emphasis added). Determining whether an *individual* officer is entitled to qualified immunity involves a two-step analysis: 1) whether the individual officer violated Mr. Williams's constitutional rights; and 2) whether those rights, "articulated at a meaningful level of particularity," were clearly established at the time of the incident. *Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017). As the majority notes, "[o]ur cases demonstrate a painstaking commitment to an individualized qualified immunity analysis, especially when the facts relative to the alleged constitutional violation differ from defendant to defendant." Majority Op. 13–14.

The district court failed to follow this elemental step. Although its recitation of the facts acknowledges the officers'

varying encounters with Mr. Williams, its qualified-immun-ity analysis does not reflect an officer-by-officer approach. Instead, the court reached a blanket conclusion that the officers had violated Mr. Williams's constitutional rights and that those rights, considered abstractly, were clearly established at the time that Mr. Williams was apprehended. Counsel and this court, therefore, were left with a vague, amorphous determination. As a result, there was much confusion in the briefs and at oral argument as to whether the defendants were attempting to appeal a question of law or of fact as we, in effect, struggled to do the work of the district court.

Turning to the second infirmity, I have grave reservations about our deciding the question of our own jurisdiction on the prong-by-prong basis of substantive qualified-immunity analysis. Courts do not exercise jurisdiction over "prongs" of a substantive analysis; they exercise jurisdiction over judgments or orders of courts whose actions are subject to their review. Indeed, in deciding that the denial of qualified immunity was an immediately appealable collateral order, the Court spoke in terms of the "claim of qualified immunity." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

Here, we either have jurisdiction over the order of the district court denying qualified immunity or we do not. In the case of an order denying qualified immunity to an individual officer, we may consider such appeals to the extent the defendant presents an abstract issue of law: whether the actions of a defendant violated the constitutional rights of the plaintiff or whether the right violated was clearly established at the time that the defendant acted. *See, e.g.*, *Green v. Newport*, 868 F.3d 629, 632 (7th Cir. 2017). Appellate review is precluded only when the district court's denial of qualified immunity is

based on a factual issue that cannot be divorced from the purely legal questions related to qualified immunity. *See Levan v. George*, 604 F.3d 366, 369 (7th Cir. 2010) ("If the denial of qualified immunity turns on factual rather than legal questions, the denial is not properly subject to appellate jurisdiction under the collateral order doctrine because the decision is not 'final.'"). Even if key facts are disputed, however, appellate review still is possible when, for purposes of appeal, the defendant concedes that the plaintiff's version of the facts is correct or when the defendant accepts that there are factual disputes but takes each disputed fact in the light most favorable to the plaintiff. *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011). In short, the presence of a pure question of law as to either prong of the qualified-immunity analysis provides a basis for our jurisdiction. However, our jurisdiction over the *claim* of qualified immunity, once jurisdiction is secure, is not so limited.

I am aware of only one published opinion from our court, *Estate of Clark v. Walker*, 865 F.3d 544, 551–53 (7th Cir. 2017), that explicitly employs a prong-by-prong consideration of jurisdiction. *See also Broadfield v. McGrath*, 2018 WL 2722504, at *3 (7th Cir. June 6, 2018) (unpublished) (relying on *Estate of Clark*). However, *Estate of Clark* neither explains the rationale behind, nor the authority supporting, its use of jurisdictional terminology. No doubt, we and other courts have employed the term "jurisdictional" in a casual manner when discussing appellate review of qualified-immunity cases. However, in other contexts, the Supreme Court has noted that "[j]urisdiction … is a word of many, too many, meanings," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)), and has cautioned us against transforming procedural and prudential

rules into jurisdictional mandates, *see Kontrick v. Ryan*, 540 U.S. 443, 454 (2004). Similarly, we should be cautious in conflating the substantive analysis of a claim of qualified immunity with the question whether we have jurisdiction to consider that claim.

As I already have noted, I agree with my colleagues that this case comes to us in an unfinished state, a condition that impeded significantly the ability of counsel to present the appeal to us and that makes careful decision-making on our part difficult. Given the state of the record, the appropriate course is to pretermit the question of appellate jurisdiction and remand the case to the district court for an individualized determination of qualified immunity for each of the defendants.[1] Once we have a more fulsome analysis, we then can consider whether we have jurisdiction as to the qualified-immunity claim of each defendant and assess seriously whether a prong-by-prong approach to jurisdiction is appropriate.

---

[1] We could "undertake [the] cumbersome review of the record," *Whitlock v. Brueggeman*, 682 F.3d 567, 574 (7th Cir. 2012) (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)), here and determine whether, taking the facts in the light most favorable to Mr. Williams's estate, each individual officer violated Mr. Williams's Fourth Amendment rights and whether the contours of the Fourth Amendment right were sufficiently clear that each individual officer "would understand that what he [wa]s doing violate[d] that right." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (internal quotation marks omitted). But because the ability of counsel to brief the case in an effective manner may well have been impeded by the district court's failure, the far more prudent course is to require the district court to undertake the initial assessment. This approach is especially advisable when this process well may alter the district court's determination with respect to at least some defendants.